## Case No. 5,478.

### The GLAUCUS.

[1 Lowell, 366.] [1]

District Court, D. Massachusetts. July, 1869. [2]

COLLISION—STEAM AND SAIL—LOSS OF CARGO—DAMAGES—FREIGHT.

1. Quaere, what is the true construction of Act July 25, 1866 [14 Stat. 228], which requires ocean-going steamers and those carrying sail, to have one white light as prescribed by the act of 1864 [13 Stat. 58], and requires coasting steamers to carry two such lights, the fact being that many coasting steamers are ocean-going and carry sail?

2. If a sailing vessel and a steamer are crossing at an angle of forty-five degrees, and the pilot of the steamer sees both lights of the sailing vessel at any considerable distance, and the steamer is going twice as fast as the sailing vessel, and puts her helm so as to increase the distance between them, it is impossible that any act done on board the sailing vessel after both her lights were thus seen, should bring the vessels together, stem and stem.

3. If a vessel is capsized in a collision. and the master and crew abandon her to save their lives, and in the exercise of due care and skill the master decides not to try to save her, the loss is presumed to be total.

4. If the owners of a vessel send her to a foreign port for a cargo, which the master procures by barter, the damages for a loss of the cargo are what the master paid for it, to the person of whom he bought, and not what it cost the owners, on the whole, to obtain it by the adventure.

5. To this may be added an allowance in the nature of freight for the voyage from the foreign port, which has increased the value of the goods, and has been destroyed by the collision.

6. If the owner of a vessel injured by collision, has repaired his ship, with prudence, skill, and diligence, and acting as a wise owner would, if not insured, the wrongdoer may, in some extreme cases, be liable for even more than the value of the ship, if the excess is

made up by an unexpected amount of demurrage.

[Cited in The Cambridge, Case No. 2,334; The Venus, 17 Fed. 926; The Rabboni, 53 Fed. 957.]

At about ten o'clock, on the night of the first of February, 1868, the schooner Electric Flash, with a full cargo of frozen herring on board, was beating up Long Island Sound on her voyage from Newfoundland to New York. and was off New Haven. She was making about five and a half knots, and was close-hauled on the port tack, heading about northwest by west, the wind being a whole-sail breeze from west southwest. The large propeller steamer Glaucus was bound from New York to Boston, with a full cargo, and was making about eleven knots, heading east by north. The moon and stars were shining and the night was clear. The vessels came together, and the schooner received a very severe wound in the larboard bow, which cut her down on that side, and started many of the planks on her starboard bow as well; she filled and capsized, and her crew saved themselves in their boat and were brought to Boston by the steamer, it being thought upon examination that she could not be towed into a port of safety by the Glaucus. She was afterwards taken to New London by salvors. Both vessels had the proper side-lights, and the steamer had two white lights, one at her bow and one at her mast-head.

J. C. Dodge, for libellants.

F. C. Loring and M. F. Dickinson, Jr., for claimants.

LOWELL, District Judge. The libellants cite the statute of April 29, 1864 (13 Stat. 58), which prescribes for steamers only one white light at the foremast-head, and prohibits all lights not prescribed. The claimants say that all the Sound steamers carry two, and rely on Act July 25, 1866, c. 234, § 11 (14 Stat. 228), which enacts: That the provision for a foremast head-light for steamships, in the former act, shall not be construed to apply to other than ocean-going steamers and steamers carrying sail; and that all coasting steamers and those navigating bays, lakes, or other inland waters, shall carry, besides the red and green lights, a central range of two white lights, one of which is to be at the head of the vessel, &c. It is not shown that the two lights of the Glaucus did not conform to this later statute, nor that the misfortune was in any way attributable to the state of her lights. I refer to this point because the law of 1866 has not been cited here before, and because its language does not seem to be very happily chosen. It puts ocean steamers and steamers carrying sail, in one class with one sort of lights, and coasting steamers in another, with a different sort, whereas most of the coasting steamers on the Atlantic coast, are both ocean-going and carry sail, so that it may sometimes be difficult for the persons concerned to know to which order they belong. For-

---

[1] [Reported by Hon. John Lowell, LL. D., District Judge, and here reprinted by permission.]

[2] [Affirmed in Case No. 683.]

tunately, however, nothing turns upon this distinction in the present case.

The Glaucus was bound to see the schooner on such a night as this in good season, and to avoid her; and if it be true, as is testified, that propellers of this size and class are slow in minding the helm, this only makes it the more essential that the greatest vigilance should be exercised by their officers and crew to discover sailing vessels at the earliest possible moment, for it cannot change the law, nor can it be so great an obstacle as to excuse the steamer altogether, and except her out of the general rule of law on such a night as this. All this is well understood by the claimants; and they aver that the steamer took all proper measures, but that the schooner ported her helm, and thus caused the collision.

The pilot, second mate, and quartermaster of the steamer were in her pilot-house, and there was a man forward on the lookout. The pilot testifies that he saw a red and a green light about four points on his starboard bow, thought the vessel was a steamer, but that there was no danger, and starboarded a little; presently observed that the green light was shut in, and saw sails on the vessel, and then ordered the wheel hard a starboard, and afterwards finding he could not run ahead of the vessel stopped his engine. He estimates the distance at which he first saw the lights, at three-quarters of a mile. The testimony of the second mate and quartermaster is substantially similar. The lookout saw only the red light; he makes no estimate of the distance at which he first perceived it. They all think the schooner changed her course, and that is the disputed question of the case. The appearances on which they rely are, that the sails were more and more plainly seen as the vessels approached each other, and that the green light disappeared.

I have carefully considered the claimants' evidence on this point, and am not satisfied that the fact is proved. The steamer changed her course, and it was impossible for her crew to say whether the schooner did so or not, unless they had something besides their own vessel to compare her with, or unless the effects which they saw could not be accounted for by their own change of course. They feel very sure that she did change, and none the less so, because if she did not the steamer must have been in fault. That the sails on the port side of the schooner were seen more plainly as the vessels approached each other is accounted for by the fact of approach. If both lights were seen, and then only the red light, and the steamer kept her course, the schooner must have changed hers; but the steamer did not keep her course, and I doubt if they ever saw both lights. The witnesses who depose to this were mistaken in two of their suppositions, and may have been so in a third; they took the Electric Flash for a steamer, and they thought her not dangerously near. In this case neither vessel could

see both the side-lights of the other until she was crossing her bow. Seeing both lights means that you are on the course of the vessel whose lights you see. If two vessels are on opposite courses, each is on the other's course; but here the vessels were approaching at an angle of forty-five degrees, and neither could see along the line of the other's course till she was crossing her bow. If the steamer then was across the bow of the schooner when she first made her out, and was going twice as fast as she, and so manoeuvred as to increase the distance between them, all which is averred by the claimants, a collision was impossible, whatever the schooner might do, unless the vessels were so near when the steamer first discovered the lights that it was already almost inevitable; and however near they may have been, their bows could hardly come together under those circumstances. I repeat that the pilot's account that he saw both lights of a vessel four points on his starboard bow and starboarded his helm, and was going twice as fast as the other vessel, which by porting her helm struck his stem, is incredible, unless it all happened in less than one minute; and if this heavy and slow-working steamer had swung three points to port under the influence of her starboard helm, it would seem that some considerable time must have elapsed. No sudden or accidental change of the schooner's course to bring both her lights to view is possible, because such a change must have been to windward, and she was close to the wind and did not tack. I cannot but believe that the men in the steamer's pilot-house were either mistaken in thinking they saw both lights, or else that they have much overstated the time that elapsed. The lookout, who should have seen the schooner first, saw only the red light; and this is precisely what he should have seen, on the theory of the libellants.

The libellants' witnesses are clear and consistent in declaring that the schooner's course was not changed. (The judge here examined the evidence on this subject.) I am satisfied that the steamer has not only made out no sufficient justification, but that the facts show affirmatively that she was in fault. She is in the dilemma that she should either have slowed her engine, and, if necessary, have stopped and reversed, as the statute requires; or if it was too late for that, and she took the most prudent course after seeing the schooner (which I am inclined to believe), she should have seen her sooner. Interlocutory decree for the libellants.

On the coming in of the assessor's report, the case was again spoken to by the same counsel.

LOWELL, District Judge. The report of the assessor in this cause is excepted to by both parties. It seems that the schooner belonged at Gloucester, and was sent thence to Fortune Bay in Newfoundland, by her owners, for a cargo of frozen herring, which was

obtained, partly by purchase and partly by barter; and while on her voyage to New York with this cargo on board, she was run into in Long Island Sound on a dark and windy night and sunk to the water's edge by the steamer Glaucus, and was abandoned by the master and crew, and picked up after some days and taken into New London, where she was repaired.

The respondents maintain that they should not be made responsible for the loss of the cargo, because it might, by due diligence, have been saved. This is an important point of fact which affects a part of the damage to the vessel as well as the whole of that to the cargo, and the assessor has reported the evidence; upon consideration of which I agree with him, that the master acted in good faith and with reasonable skill and diligence in the premises. He was of opinion that his schooner would sink before she could be towed into the nearest port, and the master and pilot of the steamer appear to have been of the same opinion; and the mate of the Glaucus, after examination, reported that the steamer could not safely undertake to tow her. It was only the extreme and unusual coldness of the weather, which kept the fish frozen, that prevented the schooner from going down within an hour or two after the disaster occurred. The general rule of "post hoc propter hoc" applies in these cases, and it is for the vessel in fault to show that the negligence or want of skill of the libellants, or their agents, has aggravated the damages which would have naturally followed their own wrongful acts. I affirm the report on this point.

In ascertaining the damage to the cargo, the assessor has made a careful and ingenious computation of the cost of the voyage to the owners, as being the actual cost to them of this cargo. This is too speculative a mode of ascertainment when the price paid for the cargo is in proof, because it makes the value depend not on what the cargo cost in fact, but on the results of a different though connected adventure. I decided in the case of The Monticello [Case No. 9,739], that the prime cost and interest was the rule; this the assessor was well aware of, but saw that these libellants had really lost more than that sum. This does not change the rule of damages nor the price of the cargo. The purchaser cannot have paid for these herrings more than the seller received, which was $1.68 per barrel. The cost of getting that sum to the place where the bargain was made is no part of the price. The loss was later, and was in the nature of freight from Newfoundland. The owners who load their own vessel are held responsible for freight, eo nomine, in ascertaining the limit of their statute liability in collision cases. Allen v. Mackay [Id. 228]. If, therefore, they had wrongly injured the steamer, they would be held to be earning freight, and when the other party is in fault they should have a corresponding advantage. The assessor, therefore, may allow such a sum as would be the fair net freight, above expenses, for the voyage from Fortune Bay to New York, though not the freight or expenses from Gloucester to Fortune Bay, which is the form in which the account has been made up; or, what is the same thing, he may consider the goods as increased in value by that amount. In this assessment the market value, if there be one, will be the guide; that is, what the charter-money for such a voyage would be, less sailing expenses.

The only remaining exception of the respondents is that the repairs of the vessel and the demurrage together, as allowed, amount to more than the value of the vessel immediately before the collision. They contend that the extreme limit of damages is what would be assessed for a total loss. The assessor finds that the schooner was carefully surveyed, and that the libellants acted in good faith and with care, skill, diligence, and fidelity; that the excess of price over the estimates could not have been foreseen, and that this excess and the demurrage were enhanced by the unusually bad weather which happened to set in while the work was going on. The repairs themselves cost much less than the value of the schooner, and appear clearly by the report to have been such as a prudent owner would have undertaken. Under these circumstances I affirm the allowance of demurrage, even though this brings the total damages to a higher point than they would have reached if the schooner had been abandoned in the first instance. The case of The Empress Eugenie, Lush. 138, cited in argument, rests upon the principle that the wrongdoer shall not be held responsible for the repairs which a prudent and well-advised owner would not have undertaken, and in that point differs materially from this case.

Neither party having excepted to the amount of the demurrage, I assume that it was reckoned upon the proper basis. In collision cases demurrage is to be allowed for such time, if any, as the evidence shows that the vessel could have been employed, and at the net freight she might have earned less the expenses.

The exceptions of the libellants that the commissioner did not assess the value of the cargo in New York, and that he did not reckon deterioration of the vessel on her voyage from Gloucester to Newfoundland are overruled.

The report must be recommitted to the commissioner to find the amount of net freight which should be charged on the principles above stated, unless the parties can agree on it. The means for ascertaining the value of the cargo are already contained in his report. Order accordingly.

Affirmed on appeal, October term, 1870 [Case No. 683].

GLAUCUS, The (AYER v.). See Case No. 683.

GLEASON (CODWISE v.). See Cases Nos. 2,938 and 2,939.

GLEASON (UNITED STATES v.). See Cases Nos. 15,215 and 15,216.