Haines, J.
• A petition in error is brought for the purpose of reversing the judgment of the court of common pleas in an action wherein Alvin Peter was plaintiff and the H, M. Loud & Soria Lumber Company was defendant — a case which was. tried to the court, a jury being waived by the parties. This case was argued at the last term of this court,, towards-its close. It being a case of importance and in some respects-rather novel, not having time to fully consider it then, we-continued the case until the present term. We have now taken the case up, and.have read the record and the very full briefs of counsel in the case, and all of the decisions-that have been cited by counsel on either side, who have-been industrious and learned in the collection of decisions and reports.
The plaintiff charged that the defendant the Loud &Sons Lumber Company, in November, 1895, agreed to load the Sprague, a scow so called, belonging to the plaintiff, at and from the docks upon the lake front at Oscoda, in the state of Michigan; and the gist of the action is found in this paragraph:
“It was further agreed between said parties that the said defendant should at all times, while the said Sprague was at Oscoda in the service above stated, keep a tug at said *75 point which should at all times be in readiness to move the-said Sprague from point to point, and in case of storm to-move her to a point of safety. The defendant was at that time the owner of a tug called the Petrel, which was located at that point, and which was the only tug at that point available for said service, and was the tug which the said defendant agreed to keep at said port for the service above indicated.”
The petition then avers that the boat proceeded to receive her load, commencing to load on the 28th day of November, 1895; that she had very nearly finished loading about 4 o’clock on the afternoon of the 28th, when a very heavy storm arose, and was of such severity that the boat was sunk and seriously injured.
This is met by the defendant with a general denial, so fár as the material points are concerned, and on those issues the case proceeded to trial.
Testimony was offered on behalf of the plaintiff below tending to sustain the allegations of his petition,- and on behalf of the defendant in opposition, Briefly, it appears that some little time before this Mr. Peter had made an arrangement with one McGlone, who was then an agent for the Loud Company, at Toledo, to send this vessel to Oscoda to receive a cargo of cedar posts which the Loud & Sons Company were to furnish. The vessel went in a tow. There were three vessels in the tow, the Swallow being a propeller, the other two being scows. The Sprague was the only boat that was owned by Peter, They proceeded to Oscoda, arriving there about the 24th of the month, At night there was a heavy wind came up. These vessels, together with the Petrel and perhaps some other vessels, were lying in a dock at Oscoda called Pennoyer’s dock. After the storm had abated the captain of the Sprague, together with the captain of the Swallow, went to ¿he office of the defendant company to inquire about the freight, and were told that the same hadn’t come as arranged, and were'informed that the cedar posts were frozen in the bayou during the recent cold weather, and it would be impracticable to load the vessel with those. That statement seemed to be acquiesced in by the captains, and thereupon they asked Loud if he had other freight, and upon looking-over his books he said *76 he had for one vessel, and they might leave whichever one of them they chose. Thereupon the captains telephoned to Alpena to see if they could get freight there. They found they could get for two vessels. Meanwhile the captains had a further conversation with Loud, and it was- agreed that the Sprague was to be left at Oscoda, and would have to take her load at different docks. And in that conversation occurred, it is claimed by plaintiff, the disputed agreement, the plaintiff claiming the agreement was as alleged in its petition, and the defendant denying that it agreed to keep a tug there to care for the vessel — or saying anything more than that the tug, when there, could take the boat from dock to dock to take on its load, the tug at the time being used in the fishing business. Whether the contract is as stated in the petitioner whether it is otherwise, is the point upon which there is a difference in the testimony — a point of difference upon tvhich the court below was called to pass, and which has been discussed very fully by counsel in the argument of the case before ua. On that point, the case having been fried to the court, the rule that prevails in the state of Ohio is laid down by the supreme court of this state in 22 Ohio St., 122, Dean v. King et al., where the court say, that where there is a motion for a new trial upon the ground that the verdict is against the weight of the evidence, and it is overruled, “a reviewing court should not reverse, unless the verdict (or finding of fact, if the jury be waived) is so clearly unsupported by the weight of evidence as to indicate some misapprehension, or mistake, or bias on the part of the jury, or a willful disregard of duty,’’ In case it is set aside, it must appear that the court below rendered a decision against the clear weight of the evidence.
Guided by the rules laid down by. the supreme court, we are unable to say that the court has erred in coming to the conclusion that this contract was made as set out by this petition. Indeed, the testimony was very strong that it was made as stated. Unfortunately it was not reduced to writing, and perhaps not as distinctly remembered as it ought to have been. But’so far as the main contract is concerned, it was made by these two captains with Henry M. Loud, the secretary of the company, when no other person was present — -the two captains asserting on the one *77 hand that it is as stated in the petition; Mr. Loud denying that it went as far as was claimed by these parties, and denying especially that he had agreed to furnish the tug or to keep a tug there for the purpose of protecting the Sprague. Additional testimony to support that is offered by the captain of the Petrel, who testifies to a conversation he had with the captain of the Sprague, which is contradicted by the captain of the Sprague and his mate. I am not certain but that if we were called upon to try this case as original triars, we would have come to the same decision as the court. Be that as it may, we do not think that we are called upon to interfere with the decision of the court.
I should mention that on the 29th, the last day, the Petrel, which was engaged at the time in the fishing business for a firm composed in part of the Loud & Sons Company and another party, proceeded to a point out in the lake about eighteen or twenty miles, for the purpose tof raising nets and bringing in fish, There was left in he harbor only two vessels of any kind that were operated by steam; one was called the Martini, and was a sort of a square rigged scow, propelled by steam. That was loaed for lumber, and was perhaps engaged in local trade — not a very large boat, nor very much of a sea-going boat, I judge by the description of her and from her build. The other was a small tug, called the Angler. At noon the captain of the Sprague, designing to go to another dock near by, asked of the captain of the Martini who was lying near him, loading perhaps from the same dock, if he would take the Sprague around. The captain did take her around at the noon hou r, and went to his position and went on loading. He continued to load until about 4 o’clock, when the storm commenced, and thereupon he got up steam and started away for safety, and went to Tawas, dr started for Tawas; but as he was starting the captain of the Spraghe asked him to take a line and tow him out to a place of anchorage, and he declined to do it. The captain then asked the captain of tie little tug to pass a line out to the Sprague, and he refused to do it. Neither of those boats would afford the Sprague any help. She was simply lying there at the time, with the storm on her. Tt is suggested here that she might have hedged out, and a description was given of a hedge *78 anchor, and it was said this anchor which they had could have been carried out with one of the small boats, and the Sprague kedged out, It is stoutly denied on the part of the Sprague that this could be done, and the testimony on that point is conflicting. The court below has found •against, the witnesses of the defendant in that respect, So far as we can see and so far as we are advised in regard to matters of that kind, we think the 'court of common pleas was right in that respect.
It is furthermore said that the captain of the Sprague might have scuttled his vessel, and a large amount of testimony is taken for and against on that subject. He had proceeded to load this scow. It was scow below, and whatever cabin it had was up on the main deck. They had her pretty well loaded in the hold, so that no man could go down into that, and had loaded perhaps on the upper deck a large amount of lumber. It is contended on behalf of the defendant in error that they could not have scuttled her —'there was no means of doing it, Indeed, from the testimony it. would seem that the only means of scuttling the vessel after the storm would have been to gG out in an open boat and make a hole in the side of the vessel. It is said that might have been done, but that is denied. On this point the decision is against the defendants below. We do not see how we can disturb that. Indeed, the storm arose very suddenly and rapidly, and the waves came in very heavily, and the vessel was rolling and beating against the dock, and commenced to do it at an early point in the storm. We think the testimony of the defendant there was sufficient to justify the court below in coming to the conclusion that it did on that question
The boat remained there that night, She was lying at the end of what is called the short dock, and as the storm •came up it bore her around the end so she went down on the side of the dock. The captain seems to have been efficient and active with his men in going out with his lines •and attempting to hold the boat. He got hold of the dock and was holding on to a certain extent, but some of the lines broke; and it is very evident, with the boat heavily laden with lumber, that she was rolling very heavily, and it was difficult to hold her in a proper position. A portion *79 of the dock was carried away, and the boat passed so far around that her stern came where the water was rather shallow. It was so shallow that the boat finally dragged on the bottom. The skeg of the boat was broken, it being a contrivance on the bottom for the purpose of holding the steering apparatus. The effect of that was the letting of water into the hold, and the boat commenced to and did fill, and the stern rested on the bottom. I don’t remember, but perhaps the whole of the steering apparatus was carried away. Great damage was done to the timber around the stern, and some of the railing was carried from the boat, and the boat itself was twisted so that one side was set around about eight inches lower than the other. That was the situation of the boat when the storm left her, which was on Sunday morning. The Swallow came back in the mean time, arriving there after the storm, or in the storm and about the time it'abated. She undertook to get the Sprague off, and was unable to do it. Thereupon they telegraphed to Tawas, ,1 believe, for a larger tug, and one came, and she proceeded to pull the boat off, and in a short time had her out in the open water. The boat was filled with water, but did not sink in the open water, for the reason that she had a cargo of lumber. Still, she was flooded, and was partly down. They then took her to Tawas, which consumed some time, owing to the fact that the rudder was gone and they had some difficulty in towing her; but she was gotten there some twenty four or thirty-six hours after, and was docked, and remained at Tawas until the following spring. Some of the lumber was taken off at Tawas. In the spring she was taken in tow, and taken to Bay City, where Mr. Peter, senior, had a dock, saw mill, and other property. The testimony shows that she was put into a dry dock, a survey was had of lhe vessel, and after that survey was had the owner proceeded to repair her. Her cargo was, of course, unloaded before she was sent into dry dock. After she was repaired that portion of the cargo was< reloaded, she was brought back to Oscoda, took on the remainder of the cargo she had the fall before, and proceeded to Toledo, arriving here about the 12th or 13th of June, 1896,
*80 It appears that the cost of the towing, docking, repairs, reloading, and all those matters connected therewith amounted to over $4000, Added to that there was a claim for damages of several hundred dollars, for demurrage, loss of time on the part of the vessel during the time that she was being repaired, The repairs themselves, it was said in argument and I presume it was correct, was about $1400 to $1700. The towage bills were set down under the evidence somewhere in the neighborhood of $750, the services of the seamen necessarily employed about the vessel in loading and unloading, etc., amounted to several hundred dollars, and their board to a considerable sum. The result was that the court below rendered a judgment, including interest, for $5200, of which it is said that the sum of $4800 was for damages and demurrage. A serious contention arises in regard to the correctness of the claim for damages.
In the first place in regard to demurrage, an objection was made to the introduction of testimony, and that was excepted to all the way through, but the testimony was admitted. Testimony was given in behalf of the plaintiff in regard to these various matters of repairs necessary to be made, and which were made, cost and expenses, and to that evidence, so far as I can find, no objection was made, save and except to the matter of this demurrage — at least as to a large volume of these matter's. The testimony so given by the plaintiff showed that the average rate and price for a tug to tow a vessel at that season of the year when she took the boat in the fall around to Tawas, and in the spring when the vessel was taken down to Bay City, was $6 an hour. When the boat got into the mouth of the Saginaw river she had to be lightered around. She got aground two or three times, and had to be towed stern foremost. There was no steering apparatus, and she was very difficult to handle. She was then taken up to a dry dock, and she had to await her turn, and it was some few days before she got in. She got into the dry dock and her repairs were completed in about nine days, if I understand the testimony correctly, and she then came out. The testimony offered on behalf of the plaintiff is that the repairs were made carefully and prudently; that they were made a great *81 deal more cheaply at the dry dock at that point than they could at the dry dock at Detroit or any other point where she might have been taken. The dry dock men claimed that they could do the work a great deal cheaper than it could be done anywhere else. At any rate, it was shown that the work was done as good as it could be at the time. As I have said, Mr. William Peter lived near there, had carried on business there for a long time, and Alvin Peter had lived near there, and the presumption is that they knew what the prices of materials were, and the price of work, and towage, and everything of that kind and were getting the labor done as prudently as possible. It appears that a great deal of repairing had to be done to the stern of the boat where the steering apparatus was disabled, and the boat had to be re-calked throughout. She had been calked the year before at Cleveland by Mr. Peter, and the calking that came out was new and in good condition, but owing to the wrenching that the boat had received, the calking had to be done again. The boat had to be placed in a frame and braced to bring it back to its natural position, and the repairers had to put in knees and bolts for the purpose of bringing her up to that position and keeping her there. It was done, and she was brought to' it. It looks upon the face that these repair bills were very large, but according to the testimony they were as cheaply done as could be, and there is no evidence to the contrary.
As to the question of the rule of damages, there is no ease in Ohio like this that I know of, and none was cited to us. A large number of cases were cited, and I think we have read all of them. I refer more particularly to the cases of Williamson v. Barrett, 13 Howard 101, 110; Catherine v. Dickinson, 17 Howard, 10; The Baltimore, 8 Wall., 377, 386 and 387; the Venus, 17 Fed. Rep: 925; The Cayuga, 14 Wall. 270 Wetmore v. Granite State, 3 Wall. 310; the Glaucus, 1 Lowell, 372; Hoffman v. Ferry Co., 68 N. Y., 396.
Touching this question of damages the defendant produced two witnesses who had had some knowledge of vessels —-scows—perhaps dealt in them, and owned them; bad been marine men, or dealing with marine matters for a long time, and counsel first put to them a series of questions in regard *82 to the value of véssels of this kind. One witness had seen this boat, and knew something about her, but not a great deal, and it rather looked to the court as if he didn’t desire to; perhaps we misjudge him. But he got down to where they were talking about the value, and he did not know much about that. However, the question was finally put to him in regard to the value of the vessel upon a certain statement of facts, and finally the court ruled out his evidence. Another witness was put on the stand and similar questions were put to him, and that evidence was finally ruled out; exactly upon what ground, the record does not show. It was objected very strenuously that the witnesses did not qualify themselves. The questions were more to the value of the vessel before the injury. It was endeavored on the part of the.defendant below when he was on the stand to get Mr. Peter to say what he had given for the vessel. It finally came out that he had paid some $1800 at a marshall’s sale in the year 1894. Some attempt was made to introduce the Inland Lloyd’s, and that was ruled out. There was no statement made by counsel in the case as to what it was supposed these witnesses would testify to, and the evidence which it was expected they would give must be determined, if at all, from the questions put. The rule established by the supreme court of the state and by a large number of the courts of the United States, is stated in 9 Ohio St., 41-6 and numerous other oases, that the party exceping to the ruling of the court upon a question asked of a witness in chief must state what he expects to prove by this witness, in order to enable the court to see if there has been error on account of the refusal of the court to receive the evidence, and if he fails to do so he cannot avail himself in the appellate court of the supposed error in rejecting the testimony.
We also think the questions did not call for the value at the proper time of valuation to-wit: after the repairs were made; see 8th Wallace 877, cited below.
In regard to the rule of damages in this case we quite naturally look to decisions of the supreme court of the United States. Many of, the cases, it will be observed, which oame up in that court are in admiralty, yet I do not see that the rules of damages in regard to matters of this *83 kind are different from what they would be in common law cases. The first case that I call attention to is 13 Howard, 101. That was a suit at common law in the circuit court of the United States for the District of Ohio, and was tried in Columbus back as far as ’19 or ’50, before J. J. McLean and Leavitt, and was argued by some of the very ablest lawyers in the state, among others, Mr. Timothy Lincoln, who perhaps was as good an admiralty lawyer as there was in the west, or perhaps in the east. In that case a steamer was coming up the Ohio river somewhere near the Indiana shore and the defendant had a boat that was going down. The boats collided, and the owner of the boat coming up sued the owner of the boat going down, for damages. The plaintiff’s boat was repaired. When they came to the question of damages the law was stated by the judges who decided the case as follows, commencing at page 110;
“The jury were instructed, if they found for the plaintiffs, to give damages that would remunerate them from the loss necessarily incurred in raising the boat, and repairing her; and also, for the use of the boat during the time necessary to make the repairs, and fit her for business.”
That clause, it will be observed, covers the demurrage.
“By the use of the boat we understand w.hat she would produce to the plaintiffs by the hiring or chártering of her to run upon the river in the business in which she had been usually engaged.
“The general rule in regulating damages in cases of collision is to allow the injured party an indemnity to the extent of the loss sustained. This general rule is obvious enough; but there is a good deal of difficulty in stating the grounds upon which to arrive in all cases, at the proper measure of that indemnity. The expenses of raising the boat, and of repairs may, of course, be readily ascertained, and in respect to the repairs, no deduction is to be made,as in insurance cases, for the new materials in place of the old, The difficulty lies in estimating the damage sustained by the loss of the service of the vessel while she is undergoing repairs. That an allowance short of some compensation for this loss would fail to be an indemnity for the injury is apparent. ’ ’
' They cite here an English case, and say:
*84 “That was a case of collision, and in deciding it, the court observed, that the party who had suffered the injury is clearly entitled to an adequate compensation for any loss he may sustain by the detention of the vessel during the period which is necessary for the completion of the repairs, and furnishing the new articles.”
The final controversy in this case was in regard to this matter of demurrage. The cost of raising the boat and repairing her was not finally disputed. These judges were in favor of sustaining the charge of the court below, and allowing for the detention of the boat. Mr. Justice Catron, Mr. Chief Justice Taney, and Mr. Justice Daniel dissented. But the rule was established at that time, and remains the rule of the United States court from that time to this. The latest decision on the subject is found in the case of The Cayuga, 14 Wall. 270. No one dissented at that time, and it is the established rule of that court. So that the objection that was made in this case in regard to demurrage by counsel to the admission of evidence was not well taken. The court was authorized by these decisions and by the other decisions of the supreme court of the United States to make that allowance.
There is a case cited by counsel for defendants that they rely upon and argue' — The Venus, 17 Fed. Rep. 925. That was the lien of a canal boat. The syllabus is as follows:
“Damages allowed for injuries to a vessel, by collision, cannot ordinarily exceed her value at the time of collision, i, e., as for a total loss, with cost of raising, to determine her condition, of to remove her as an obstruction, where that is necessary. To recover more, where the vessel has been repaired instead of being abandoned, special circumstances must be shown proving that the excess accrued notwithstanding the exercise of good faith and ordinary prudence and good judgment in repairing.”
But I think the rule is more correctly stated, in 8 Wall. 377—a decision made by the supreme court of the United States, in re The Baltimore. At page 389 Mr. Justice Clifford says:
“Restitution in integrum it the leading maxim in such cases,and where repairs are practicable the general rule fol *85 lowed by the admiralty courts in such cases is that the damages assessed against the respondent shall be sufficient to restore the injured vessel to the condition in which she was at the time the collision occurred; and in respect to the materials for the repairs the rule'is that there shall not, as in insurance cases, be any deduction for the new materials furnished in the place of the old, because the claim of the injured party arises by reason of the wrong act of the party by whom the damage was occasioned, and the measure of the indemnification is not limited by any contract, but is coextensive with the amount of the damage.”
Further on he says:
‘‘Evidence, however, that the injured vessel is sunk is not of itself sufficient to show that the loss was total, nor is it sufficient to justify the master and owner in abandoning the vessel or the cargo unless it appears that the circumstances were such that the vessel could not be raised and saved, or that the cost of raising and repairing her would exceed or equal her value after the repairs were made.”
The difficulty in many of these cases is that the point is not very fully or directly stated in the cases, in many of them the repairs not exceeding the value. There is a case in 1 Lowell, 366 — The Glaucus:
‘‘The only remaining exception of the respondents is that the repairs of the vessel and the demurrage together, as allowed, amount to more than the value of the vessel immediately before the collision. They contend that the extreme limit of damages is what would be assessed for a total loss. The assessor finds that the schooner was carefully surveyed, and that the libellants acted in good faith and with care, skill, diligence, and fidelity; that the excess of price over the estimates could not have been foreseen, and that this excess and demurrage were enhanced by the unusually bad weather which happened to set in while the work was going on. The repairs themselves cost much less than the value of the schooner, and appear clearly by the report, to have been such as a prudent owner would have undertaken. Under these circumstances I affirm the allowance of demurrage, even though this brings the total damages to a higher point than they would have reached if the schooner had been abandoned in the first instance.”
H. 8. Bunlcer, J. O. 8haw (of Mich.), for Plaintiff in Error.
Kinney & Newton, J. E. Simon (of Mich.), for Defendant in Error.
I have not time to discuss or read further from 'any decision. All these cases that I have cited are interesting, and profitable to be examined at length. We are satisfied from the evidence that this boat was not a total loss — ought not to be called a total loss; that the plaintiff below was justified in having her repaired. It seems, as I have already said, that the cost of the repairs was high, but the plaintiff below seemed to have exercised all reasonable care and prudence in the matter; and if we were to adopt any rule that would limit that amount, we would adopt it at the price of this vessel after the repairs had been made. That seems to be the logical sequence of the proposition laid down in 8 Wallace — although the repairs are valuable, useful and more valuable than the old, no allowance is made, and the benefit of that goes to the person who makes the repairs: the owner.
I have endeavored to touch all the points involved, and have occupied more time than I intended. We are of opinion on this record, aftera very full and careful examination of it, that it is our duty to affirm this judgment, and it will there fore be affirmed, but reasonable cause will be certified for filing the petition in error, and no penalty will be allowed.