## THE KENNEBEC.

(District Court, E. D. New York. July 16, 1900.)

ADMIRALTY—CLAIM FOR SINKING VESSEL.—NEGLECT TO DISPLAY LIGHTS.

In a channel from 400 to 450 feet wide, eight vessels were moored abreast off a coal dock on a dark and foggy night, occupying nearly 190 feet of the channel, at a distance of 350 feet from a steamboat dock. The masters of the vessels went to bed, knowing of the fog, and, if any lights at all were displayed outside the cabin, they were only those of ordinary lanterns. When about five-eighths of a mile from the coal dock, the claimant, which was approaching the steamboat dock, reduced her speed to one bell, blew fog signals, and, before the collision in question, had stopped her engines, so that the vessel was being carried by the tide. The pilot in charge of the wheel of the claimant was a man of long experience, and the compass course pursued by him carried his steamer about 100 feet off the face of the coal dock, which course was approved by previous experience. Although three men besides the captain were in the bow of the claimant on the lookout, the vessels at the coal dock were not discovered until within about 50 feet, when the pilot gave the signal to back, but the forward movement was not stopped before the steamboat struck a barge belonging to the libelant, which was driven forward up the river and sunk, and for which damages are claimed. *Held*, that common prudence demanded that vessels appropriating so large a portion of the channel should employ adequate means to make their presence known, and that, the course of the claimant's pilot being a fair navigation of the channel, in the absence of any warning apprising him of interruption the libel should be dismissed.

Robinson, Biddle & Ward and Mr. Hough, for libelant.
William J. Kelly, for claimant.

THOMAS, District Judge. At the entrance of the Quinnipiac river flowing into the harbor of New Haven are three docks,—the coal dock, the water dock, and the steamboat dock. The total distance from the coal dock to the steamboat dock is about 350 feet. On the night of October 26, 1899, there were lying off the coal dock a schooner and two barges, and at about half past 8 on such night a tug added five barges; making in all eight vessels abreast said dock with their bows pointing upstream. The outside barge—No. 1—belonged to the libelant; next inside was the barge called the "shell boat"; next lay barge No. 11, which is involved in this action, such barge being 91 feet long and 22 feet wide. At the time the five barges were added the night was dark, and somewhat foggy. The channel at this point is about 500 feet wide from the face of the pier, and was understood by the persons having occasion to use it to be 400 or 450 feet wide. Of this space nearly 190 feet were occupied by the boats lying off the pier, and past such coal dock and boats and through such interrupted channel the steamboats plying from Providence to New Haven, and from New Haven to New York, and from New York to New Haven and Providence, necessarily went in order to reach the steamboat dock, where they received and discharged passengers and freight. The coal dock and water dock belonged to the New York & New Haven Railroad Company, and vessels were accustomed to tie up to the coal dock by implied contract with the owners. The practice of so tying up was of long

standing, and it was not an extraordinary event for a larger number of vessels to lie off said dock than those in such position on the night in question. About half past 9 or quarter of 10 the master of barge No. 11, the only person aboard of her, went to bed, knowing of the fog, and, as he claims, he left as the only signal a white light in a six-inch lantern standing on the galley, which was about eight feet above the deck. He states that the shell boat next outside of him also had a lantern on her house, and that No. 1, the outside boat, carried a lantern on her flagstaff. The captain of the shell boat, the captain of No. 1, and the master of No. 6 confirmed this statement. About 10 o'clock the Richard Peck, a steamboat about 315 feet over all, passed the coal dock bound for the steamboat dock. Then the fog was such that the captain saw the barges 700 or 800 feet away, and was obliged to go further to the eastward in the channel to avoid them. He states that at this time there were no lights burning on any of the barges. Charles French, the agent of the steamboat company, states that he was at the end of the steamboat dock when the Peck came in, and that he saw the boats at the end of the coal dock; that he thought their presence was dangerous to the incoming steamers, inasmuch as there was no light displayed upon them, and no sound came from them to warn approaching vessels. Redman, the watchman on the steamboat dock, states that when the Peck came in he was at the end of the dock, blowing a fog horn; that from his position he could make out the Peck about the time she got to the coal dock, by her form; and that there was no light on the boats, the number of which he places at 12. His distance from them was about 350 feet. He states that he went to the water dock, and complained to the servant of the owner of the coal dock that there were too many vessels lying off the pier, and he states the number of vessels was extraordinary. Coleman, foreman of the steamboat dock, states that he could see the boats when the Peck came in, and that there were no lights on the flotilla of boats; that when the Peck came in she sounded a fog whistle far away, and that he made out her form and light about the same time.

Such seems to be the evidence relating to the conditions existing at the time of the arrival of the Peck. She remained at the steamboat dock about an hour and a half or two hours, and then went on her way to Providence. About 1:30 a. m., the Kennebec, 260 feet long and 58 feet wide, bound from Providence to New York, attempted to go to the steamboat dock. Aboard her was a pilot, McMullen, a man of long experience in connection with the New Haven Harbor. Such pilot took charge of the wheel, and devoted himself entirely to steering his vessel upon a compass course which, passing the dock, was N. E. by E. ½ E., a course approved by previous experience. He states that he could take the vessel to such dock by reliance upon his compass, without reference to objects on the shore, and that such course, adopted and pursued by him, would carry him about 100 feet off the face of the coal dock. At this time the fog had greatly increased, hanging heavily over the boats at the end of the coal dock. This pilot states that the Kennebec came up

the harbor at about half speed, or at the rate of five or six knots per hour; and at Long wharf, which was about five-eighths of a mile below the coal dock, there was a red light, and that a man was also stationed there with a·horn, which he used to aid the navigation of the steamers in the fog; that at this point the speed was reduced to one bell, which was about sufficient to give steerageway, the tide being then flood; and that before the collision about to be mentioned the engines were stopped, and the vessel was carried by the tide. The evidence on the part of this pilot and others makes it clear that the·Kennebec continued to blow fog signals as she came up the harbor and approached the coal dock. The pilot states that he saw suddenly the masts of the schooner a trifle on his port bow, his vessel meanwhile moving with the tide, and the engines shut off; that he saw the masts of the schooner less than 50 feet away from the bow of his vessel, and at once gave a signal to back; that this forward motion could have been stopped within 125 feet, but that his headway was not entirely arrested, and therefore the bow of the Kennebec struck the starboard quarter of No. 11. The tide aided the forward movement. Barge No. 11, although tied with four lines, was driven forward up the river, where she sank. She was afterwards raised about opposite the water dock, and 40 feet away from the face thereof. For the damages thus arising the present libel is filed. The pilot states that as he approached there were no lights on any of the vessels, and that he saw no lights until after the accident, when he states, "I see right down under us—whether it was lights in the cabin or where they were—I see one or two lights on our port side." He does not know whether there were lights on the starboard side, because he claims that it was not his duty to be looking for lights, but to steer according to his compass. He also states that the lights were of no consequence in such a fog, as sounds were alone available. He testified that his compass course was adopted in the expectation that nothing would be found outside the coal dock, and that notice of any vessels lying there would be given in some proper manner. He testified that after the accident he saw four barges, a schooner, which, together with the No. 11, which sank, and the two vessels which floated away, make eight vessels. Joseph Collins, the captain of the Kennebec, does not entirely agree with the pilot. He states that there was a watchman on the lookout until the Kennebec reached Long wharf, and that at such point the second pilot joined such watchman on the bow of the vessel. He confirms the pilot's evidence as to the speed and caution with which the Kennebec approached the coal dock, adding, however, that the Kennebec stopped twice between Long wharf and the coal dock to get bearings; that he saw the masts of the schooner about 300 feet away, and three points on his port bow. He first stated that he thereupon backed strong, but, upon it being suggested that he would hardly back on account of an obstacle so far away and so far on his port bow, he stated that he did not go back at that time, and not until the barges were reported to him by the watch on the bow. He states that he received a hail respecting such barges, and further that he could have stopped in less than half a minute. He is positive that there were

no lights on any of the barges. McDonald testified that he was on lookout at the extreme bow of the Kennebec, and that the regular watchman and the second pilot were there with him; that, after passing Long dock, he saw and reported, 200 or 300 feet away, and about 2½ points on his port bow, the topmasts of a schooner, but that the fog was so dense below that he could not see the lower masts; that he saw the barges only about 40 feet away, when he reported "Dark object ahead"; and stated that there were no lights on the barges, and no signals came therefrom. Marson, the second pilot, states that at Long wharf he went to the bow on the port side, and saw what he took to be a mast or coal derrick at the coal dock, and that McDonald, the watchman, reported the same; that he next saw "two little lights—very dim lights, like a tallow candle—right down forward close to the bows"; that he hollered "Stop and back!" and then the collision came. He judged that the lights were in the cabin. He states that the lookout reported a "vessel on the port bow," but does not remember that he reported the dark objects. The engineer of the Kennebec gives evidence tending to show that the vessel was navigated cautiously in approaching the coal dock, although his evidence does not accord entirely with that of the pilot. Such is the testimony of the persons engaged in the navigation of the Kennebec. Redman, the watchman on the steamboat dock, states that he heard the fog whistles from the Kennebec; that he blew the horn, and that he could see the outline of the boats lying off the coal dock, " not very plain. I could see them plain enough to see the boat"; that there were no lights on the boats at that time, and that he saw the mast light on the Kennebec about the time that she struck. Bannon, assistant foreman, stated that he went to the end of the dock before the Kennebec came up at about 1:30 a.m.; that there were no lights; that he could see the form of the boats at the end of the dock; that he heard the fog signals, heard the watchman blowing his horn; that he saw the Kennebec's light before she struck. Coleman, the foreman of the steamboat dock, states that he saw the two outside boats that drifted away after the collision, going out to them in a rowboat, and that they had no lights. He states that he saw the light of the Kennebec slightly after the crash.

Upon this evidence the conclusion is preferred that the Kennebec approached the coal dock well piloted, at proper speed, with sufficient men on lookout, and capable of being stopped within 125 feet. But why did not the lookouts, or any of them, see the boats so as to enable the Kennebec to stop within that distance? Redman and Bannon on the steamboat dock saw them 350 feet away. But such persons had been watching them, accustomed their eyes to locating them, and therefore had superior opportunity, and at last they saw dimly their outline. The captain and the three men in the bow were keeping lookout. They were obviously vigilant, and it is easily inferable that they, or some of them, would have discovered the boats earlier if the conditions permitted. But, with a channel 400 or 500 feet wide, by what right did the steamer lay her course by compass so that she would necessarily pass within about 100 feet of the dock,

knowing that such place was frequently occupied by vessels? The pilot's explanation is that he believed that he had a right to lay his course as he did, as it was a fair navigation of the channel, and that he expected that, if the channel were interrupted, there would be some sound or warning apprising him of the interruption, to the same extent as if a vessel were anchored in the channel. Such statement is logical; for, while it was customary for vessels to lie off the dock, it does not appear that they were accustomed to lie there with a total width of 187 feet, in a dense fog, without sufficient lights or warnings. Moreover, if a vessel may not anchor in the channel 100 or 175 feet from the pier without taking due measures, in the midst of a fog, to give notice of her presence, by what right may she tie up outside other boats, in the whole occupying nearly half of the channel? Her position is the same. In one case she is held by her anchor, in the other by her connection with the other boats. The occupation of a main part of a water way for anchorage without prudent warnings is highly dangerous and inexcusable. It is objected that the statute does not require lights or signals. Even so, common prudence demands that ships appropriating a quarter or third of a channel should use care to employ adequate means to make their presence known. But were the lights sufficient? The masters of these vessels went to bed, leaving only ordinary lanterns to apprise incoming steamers that they lay in the very way of navigating vessels. It is doubtful whether even such lights were displayed outside the cabin, but, if they were there, they were utterly powerless to give warning in a dense fog. But what shall be said of the steamboat company's knowledge of the fact that these boats were lying off the coal dock in an extraordinary number, as the watchman states,— a dangerous obstruction to navigation, as the agent of the line testifies,—and yet that condition be allowed to continue without giving warning to incoming steamers? If it were dangerous for boats to lie in this position, the agent in charge had knowledge of the fact, and was it not his duty to take some measure to protect incoming steamers? But such fault was that of the owner, and it is doubtful whether such negligence can be imputed to the ship in an action in rem. If the ship did her whole duty, such nonfeasance of the owner on shore as here appears would not seem to be imputable to the res. But it is not necessary to determine this question, as such culpability is not specifically urged against the Kennebec. It follows from the foregoing views that the libel should be dismissed, with costs.