## THE KENNEBEC.

(Circuit Court of Appeals, Second Circuit. April 3, 1901.)

### No. 104.

1. COLLISION—MOORED VESSELS—PRECAUTIONS REQUIRED IN FOG.

The fact that there is no rule requiring vessels to display lights or give signals during a fog, while moored to a wharf, does not relieve them from the duty of taking such precautions where the circumstances are such that ordinary prudence requires it.

2. SAME—OBSTRUCTION OF CHANNEL—FAILURE TO DISPLAY LIGHTS.

Eight vessels were moored abreast at a coal dock on a dark and foggy night, extending 185 feet out into a channel which was not more than 500 feet wide. No watch was maintained on the vessels, no fog signals given, and no lights displayed, except ordinary lanterns, most of which were placed on the decks, and which could be seen only a very short distance, owing to the fog. During the night a steamer came in on her regular trip, and was compelled to pass up the channel to her own dock, above. She was in charge of a competent pilot, and on a course which took her 100 feet outside the coal dock. She had proper lookouts, and was under only sufficient speed to give her steerageway, and could be stopped in a distance of 125 feet. Her lookouts did not see the lights on the moored vessels until she was within 50 feet, when she at once reversed, but came in collision with libelant's barge, which was the sixth vessel from the dock, and sunk her. *Held*, that the steamer was not chargeable with any fault, but that the collision was due solely to the want of ordinary care and prudence on the part of those having charge of the moored vessels, in permitting them to obstruct the channel under such circumstances without taking any measures to give notice of their presence to other vessels.

Appeal from the District Court of the United States for the Eastern District of New York.

This cause comes here upon appeal from a decree of the district court, Eastern district of New York, dismissing a libel for damages sustained by libelant's barge No. 11 in consequence of a collision with the steamer Kennebec.

Chas. M. Hough, for appellant.
Wm. J. Kelly, for appellee.

Before WALLACE and LACOMBE, Circuit Judges.

LACOMBE, Circuit Judge. The opinion of the district judge (103 Fed. 681) is most exhaustive. It not only sets forth the facts found by him, but contains a careful epitome of the evidence bearing on such questions of fact as are in controversy. We shall not undertake to restate the case in like detail. His opinion may be consulted for facts not here recited.

The Kennebec, a large passenger and freight steamboat, was bound from Providence into New Haven. Her dock lay far up the harbor, at the mouth of Quinnipiac river. Next below her dock lie two others, known, respectively, as the "Water Dock" and the "Coal Dock,"—the latter distant about 350 feet from the steamboat dock. From the face of this coal dock across to shoal water on the other side the total fairway is not over 500 feet wide. The hour was about 1:30 a. m. October 27, 1899, and there was a heavy fog. From a point in the harbor off the Long wharf, five-eighths of a mile below the coal dock, on which wharf the steamboat company had stationed a man with a horn and maintained a red light to aid the navigation of the steamer in the fog, her pilot laid a compass course which, if no obstruction were found in the fairway, would clear the coal dock by 100 feet, and bring him safely to the steamboat dock. To that course he held, and when he reached the line of the coal dock he was 100 feet outside of its face, in the fairway of the channel. There and then he encountered libelant's barge; her presence not being disclosed to those on the steamer till they were almost on top of her,—barely 50 feet off. Of all the many instances of carelessness which have come before this court since it was constituted, it may well be doubted whether there has ever been disclosed any more gross than this, which left the barge tied up in a narrow fairway just short of the terminus of a steamboat route, 100 feet out from the face of a dock, with no effort on the part of any one to advise navigating vessels of her whereabouts. The way it came about is as follows: Moored to the face of the dock, which the chart shows to be a long one, was a barge. Outside of that was fastened another barge, and outside of that, again, a schooner. These were there at nightfall of the 26th. About 8:30 p. m. a tug brought five other boats to the same place, where they were berthed one against the other outwardly from the dock; the whole eight abreast, bows upstream; the inner one fast to the pier; each of the others moored to the boat next inshore, as if such boat was a part of the pier. By adding up their respective widths, it appears that they thereby practically thrust the face of the dock, itself a lawful obstruction to the extent of its own superficies and

its proper use, 187 feet out into the fairway. In itself, this would seem to manifest a wanton and reckless disregard of the rights of others. It was aggravated by an equal lack of ordinary common sense in caring for the lives and property thus exposed. As was stated before, it was a foggy night; had thickened considerably after midnight. There had been some feeble efforts to show lights (they will be referred to later), which the fog rendered abortive. All of the men in charge of the respective boats were in bed; some asleep; others listening to the various sounds which told them other vessels were navigating. The representative of the owner of the coal dock, a watchman, was there. He allowed the vessels to tie up in the manner described. Indeed, vessels had often done so before; the owner of the dock apparently finding it more profitable to accommodate boats seeking berth by appropriating the public thoroughfare to its individual use, than by building another dock. Complaints of this abuse had been made frequently before, and on this very night, long before the Kennebec arrived, complaint was again made—to the watchman—of the manner in which these eight boats were berthed. Neither the watchman nor any other employé of the owner of the coal dock made any attempt whatever to give warning through the fog to vessels coming up the fairway that such owner was appropriating a large part of the channel to its private use that evening, and was so operating its dock as to maintain what might fairly be called a purpresture in the highway of commerce. As to the presence of any lights on the berthed boats the testimony is conflicting and not persuasive. Even accepting the testimony offered by libelant at its full value, the most it shows is that there were small lanterns on the decks of the sixth and seventh boats (counting from the dock), and a like lantern on the flagstaff of the outside boat. The fog, however, was so dense that these lights were practically useless as a warning. Libelant's boat was the sixth from the shore. The Kennebec struck her on the starboard quarter.

As to the conduct of those in charge of the coal dock and the outlying vessels it is contended by appellant that the vessels did more than their duty, by maintaining the lights they claim to have displayed; citing The Martin Dallman, 17 C. C. A. 419, 70 Fed. 797; The Granite State, 3 Wall. 310, 18 L. Ed. 179; and L'Hommedieu v. The Mischief (D. C.) 39 Fed. 510. The rules concerning lights and sound signals during fogs which were in force at the time prescribed lights for a vessel at anchor, and the ringing of a bell when at anchor in a fog, but are silent as to vessels moored to a pier. The cases cited hold that vessels so moored need show no light, but the situation was vastly different in each case from what it was in the case at bar. The schooner with which the Martin Dallman's tow collided was properly moored, "her stern west of the west end of the wharf, and her bows at the east end, around which the Dallman attempted to turn in order to enter the * * * canal. The testimony is clear that the schooner was moored out of the way of vessels going into * * * the canal." The barge with which the Granite State collided lay across the end of pier 23, East river. "She was well secured in her place, but had on board no watch

or light; the laws of the port of New York, as was proved, not making it obligatory on vessels of this sort moored at wharves to have either." The tug with which the Mischief was in collision was lying alongside her boats in tow,—how many does not appear,—which were fast to the shore of Newton creek. That case is to some extent similar to the one at bar. It was held that "not being in motion, but moored alongside other vessels attached to the shore," she was not guilty of the only fault charged against her,—failure to have a light. In The Express (D. C.) 48 Fed. 323, the vessel struck was held excused for failure to give fog signals, but she "tied up at her usual mooring place, along the southerly side of a dock, with her head towards the shore, and her stern a few feet inside of the outer end of the pier." The rules provide fog signals for vessels "under way," and define those words as meaning "when she is not at anchor, or made fast to the shore, or aground." They also provide that "a vessel when at anchor shall, at intervals of not more than one minute, ring the bell rapidly for about five seconds." There is no provision for a vessel moored to a wharf. Presumably, it may be assumed that it was not expected that when so situated she should do anything. But a situation such as the one at bar seems to be a casus omissus. It might not unfairly be argued that a boat tied up as was libelant's was not moored to the wharf at all. The district judge states the case tersely:

"If a vessel may not anchor in the channel 100 or 175 feet from the pier without taking due measures in the midst of a fog to give notice of her presence, by what right may she tie up outside other boats, in the whole occupying nearly half the channel? Her position is the same. In the one case she is held by her anchor; in the other, by her connection with the other boats."

We concur in his conclusion:

"It is objected that the statute does not require lights or signals. Even so, common prudence demands that ships appropriating a quarter or a third of a channel should use care to employ adequate means to make their presence known."

As the question is presented here, it is not so much whether this particular barge, No. 11, failed to comply with some rule, or omitted to do something which she, aside from any rule, ought to have done, thus depriving herself of a right to recover, or requiring a division of the damages. It is from the standpoint of the Kennebec that it is to be considered. She is the one charged with improper navigation, and her navigation is to be judged by a consideration of what her pilot had the right to expect. If he was entitled to assume that, rule or no rule, no one would be so devoid of common sense as to make a barge fast in a traveled fairway, and leave her there, exposing life and property to constant peril, during a dense fog, without sounding any note of warning, it makes no difference what particular person should have given such warning. No. 11 was the sixth boat from the dock, and the third from the outside. Signals warning of the presence of the other vessels would have protected her. She did not come there herself. Her tug left her, and the barge may fairly have assumed that the tug would look after her safety if

the place was perilous, or became so by weather changes. Indeed, it might have been expected that the enterprising coal-dock owner who devised this plan for turning a highway of commerce into a private anchorage would take some action to prevent risk to the lives and property which he placed there, exposed to grave peril whenever a fog shut in. Whoever was in fault for the failure to give a warning of No. 11's presence appropriate to the situation is immaterial. Somebody ought to have done so, and the pilot of the Kennebec was entitled to assume that somebody would.

The faults of navigation charged against the Kennebec in the libel are: (1) Navigating the harbor of New Haven in a fog; (2) navigating at too high a rate of speed in a fog; (3) keeping no lookout, or no sufficient lookout; (4) not stopping and backing in time to prevent the collision; (5) not taking any proper or seasonable precautions to prevent the collision. It is sufficient to refer to the opinion of the district judge for the findings on which is based his conclusion that "the Kennebec approached the coal dock, well piloted, at proper speed, with sufficient men on lookout, and capable of being stopped within one hundred and twenty-five feet." With the assistance of the man sounding a horn on the Long wharf, and a like guiding signal at her own dock, the Kennebec, with a careful and competent pilot, might very properly, so long as she exercised due caution, feel her way along to her berth. Her speed was reduced barely to steerageway, and she could stop within the space found by the district judge. Any efficient signal, warning that the coal-dock owner was obstructing the fairway, would have been heard at a much greater distance. She had two, if not three, careful and competent lookouts, who saw the boats as soon as the fog would permit. She stopped and backed at once. Indeed, none of these faults are dwelt upon on this appeal. The contention now is that it was improper navigation to proceed on a compass course, which would take the steamer 100 feet out into the fairway, when the fog was so dense that lights could not be seen soon enough to insure stopping, relying on being warned by sound that there was a boat lying motionless in the water there. But, as we have held, the pilot had a right to rely on receiving just such a warning, and is not to be charged with the knowledge that he was to find the fairway thus obstructed that night because boats had been moored at the coal dock in the same way before. There is no evidence that such a state of affairs ever existed before when there was fog, and the pilot was entitled to assume that, when the fog shut in, there would be some proper warning given, if the obstruction was there then. The decree of the district court is affirmed, with costs.