THE RHEIN (and two other cases).

(Circuit Court of Appeals, Second Circuit. March 10, 1913.)

No. 141.

1. COLLISION (§ 70*)—STEAMSHIP AND VESSELS MOORED AT END OF PIER—FAULT.

Three barges, placed by a steamship company at the end of one of its piers at Hoboken, where they projected some 125 feet into the river, were injured in a collision with an incoming steamship of another line. This vessel was intending to enter the third slip above, some 800 feet or more away, and when she headed in was caught by the ebb tide and carried down against the barges. It was in the daytime, with clear weather, and the barges were seen. *Held*, that it was the duty of the steamship to make due allowance for their presence and govern her movements accordingly, and that she was solely in fault for the collision.

[Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 91–100; Dec. Dig. § 70.*]

2. STATES (§ 12*)—BOUNDARIES—JURISDICTION OVER NAVIGABLE WATERS—HARBOR REGULATIONS—NEW YORK HARBOR.

Section 879 of the Greater New York Charter (Laws 1897, c. 378), which provides that it shall be unlawful for vessels to tie at the end of a pier in the North or East Rivers, except at their own risk of injury, does not apply to piers on the New Jersey shore, jurisdiction over which was expressly reserved to that state by the agreement of September 16, 1833, confirmed by Congress in Act June 28, 1834, c. 126, 4 Stat. 708.

[Ed. Note.—For other cases, see States, Cent. Dig. §§ 6–11; Dec. Dig. § 12.*]

These causes come here upon appeals from decrees of the District Court, Southern District of New York, which held the Hamburg-American Line solely liable for damages sustained by three barges, which lay at the end of the Hamburg pier No. 1, Hoboken, N. J., by collision with the North German Lloyd steamship Rhein. The pier in question was the upper one of three occupied by the Hamburg Line. Between 10 a. m. and the time of collision, 12:20 p. m., the latter company had shifted four barges from the slip between piers 2 and 3 to make room for a ship sailing from pier 3 at 5 p. m. There was

room in another of its slips to place these barges, but for its own convenience it moved them thus early and placed them at the end of pier 1 abreast of each other, so that they projected out into the river about 125 feet.

The North German Lloyd occupies the three piers next above the Hamburg's of which the northmost is pier 1. The Rhein came in from sea, intending to take a berth on the southerly side of pier 1. In order to do this she would have to come in on the northeast corner of pier 2 and then warp herself into the slip between that pier and pier 1. The distance between Hamburg pier 1, where the barges lay, and North German Lloyd pier 2 was about 750 feet; pier 3 of the latter company lying between. As the Rhein drew near to pier 2 of her own line, and when about off pier 1 of the Hamburg Line, she turned towards the shore, was caught on her starboard by the ebb tide, and came down upon the barges, causing the damages to recover for which these libels were brought.

Burlingham, Montgomery & Beecher, of New York City (Charles C. Burlingham and Robinson Leech, both of New York City, of counsel), for appellant.

J. L. Seager, of New York City (A. J. McMahon, of New York City, of counsel), for libelant.

Foley & Martin, of New York City (F. A. Spencer, Jr., and J. F. Foley, both of New York City, of counsel), for Wright & Cobb Co.

Choate & Larocque, of New York City (Joseph Larocque, of New York City, of counsel), for the Rhein.

Before LACOMBE, COXE, and NOYES, Circuit Judges.

LACOMBE, Circuit Judge (after stating the facts as above). [1] Whether these four barges were tied up where they were with or without sufficient excuse, they certainly constituted no hidden peril. Neither the darkness of night, nor fog, nor falling rain or snow obscured them from an approaching vessel till she was almost upon them. It was broad daylight, and they were visible (and were seen) far enough off to advise such vessel of their whereabouts, that they were not navigating, and that if she undertook to pass them she must do so without any assistance from them.

The Rhein was, therefore, fully advised of the problem before her. She knew the strength of the ebb tide which ran true there, she knew the force and direction of the wind and its probable effect upon her own superstructure, she knew her own power and speed and her measure of steerage way, she knew how much or how little she could deflect from a heading true to the tide without precipitating the buck or sheer which would come when she finally turned in for her landing to swing down against the corner of pier 2. If with all this information she came into contact with vessels made fast, the burden of excusing herself from fault is most strongly upon her. The only excuse she offered for not dealing safely with the situation she encountered is the presence of a south-bound tug and tow. That there was such a flotilla we do not doubt. The captain and the first officer so testify, and we see no reason to doubt their testimony. We are not

satisfied, however, that their presence necessitated navigation, which brought about the sheer to port. The diagram submitted by the captain of the Rhein indicates that this tug and tow were so far to the eastward of the course the Rhein was holding, to make her pier, that there would be no occasion to modify that course because of their presence.

The captain further says that the tug and the tow sheered over to to the steamer's starboard bow; whether before or after exchange of signals we do not discover. That is exactly what the tug would do under the circumstances, for her master could see the Rhein was a North German Lloyd steamer heading for the piers of that line, and, although he might be a little on her port bow when he first saw her, a prudent man would not be likely to try to run in between her and the piers. In the memorandum made at the time by both captain and first officer, no mention is made of this tug. The steamer's sheer is described as "unaccountable," which it certainly would not be if she starboarded sooner than she had intended to because a tug interfered with her, and in that way exposed herself to be bucked by the ebb tide.

Finally, the pilot who was navigating the Rhein testifies that he has no recollection of the presence of the tug and tow, which would hardly be if she had been a factor in his navigation. Moreover *his* statement to the board of pilot commissioners, made on the day of the accident, contains no reference to this tug and tow. He testified on the trial that when he got outside of the barges and nearly abreast of them he put the steamer on a course with the pier and stopped. It was then that the tide caught her bow and bore her down upon the barges. Our understanding of what happened is that the steamer's navigator turned in for his pier too soon, and that this was his own miscalculation, not brought about by the unexpected appearance of any tow which embarrassed his proceeding on the course plotted on the captain's diagram as the one they intended to take. For the results of the collision with these barges tied up to the pier we think the steamer is responsible.

It was found below that the Hamburg Line was in fault for placing those four barges at the end of the pier, so as practically to extend it 125 feet, and thereby embarrass the movements of any steamer trying to make the piers above them on an ebb tide.

It is not infrequent for barges to be tied up temporarily at the end of a Jersey pier, and we cannot see that the tying up of several of them abreast of each other can be held so to obstruct the navigable waters of the Hudson river at the place in question as to constitute negligence and make the person placing them there responsible if some vessel collided with them. The situation here is materially different from that in The Kennebec (D. C.) 103 Fed. 681, where the eight boats practically appropriated more than a quarter of a narrow fairway, and lay there in a thick fog without doing anything to advise other vessels of their presence.

[2] Appellee refers to section 879 of the Greater New York Charter (Laws 1897, c. 378), which provides:

"It shall not be lawful for any vessel, canal boat, barge, lighter or tug to obstruct the waters of the harbor by lying at the exterior end of wharves in the waters of the North or East River, except at their own risk of injury from vessels entering or leaving any adjacent dock or pier, and any vessel, canal boat, barge, lighter or tug so lying shall not be entitled to claim or demand damages for any injury caused by any vessel entering or leaving any adjacent pier."

But this section does not apply to piers on the Jersey shore. The agreement between the two states dated September 16, 1833 (4 Stat. at Large), which was confirmed by Congress (Act June 28, 1834, c. 126, 4 Stat. 708), and which gave New York certain jurisdiction over the waters of the North River, expressly reserved to the state of New Jersey exclusive jurisdiction over wharves and docks on the shore of said state and of vessels fastened thereto. The Public Laws of New Jersey of 1883, at page 247, prohibited vessels from anchoring in this part of the river within 300 yards of the end of a pier. This statute was superseded when Congress by Act May 16, 1888, c. 257, 25 Stat. 151 (U. S. Comp. St. 1901, p. 3549), took up the subject of anchorage ground for vessels in the bay and harbor of New York and in the Hudson and East rivers, and comprehensively disposed of it.

Although the presence of the barges at the end of this pier may have embarrassed the Rhein in making her landing, we cannot see how the Hamburg-American Line can be held in fault for the resulting collision.

The decrees are reversed, with costs of this appeal to the claimant Hamburg-American Line against the Rhein, and cause remanded, with instructions to decree in conformity with this opinion.