**HUDSON COUNTY et al.**

v.

**THE CHANCELLOR et al.**
**THE H. S. NO. 89.**

**Civ. 851–51.**

United States District Court,
D. New Jersey.

May 13, 1954.

---

Daniel T. O'Regan, county counsel, Jersey City, N. J., for libellants.

Foley & Martin, New York City, for Tug Chancellor, Inc.

John G. Flanigan, Jersey City, N. J., Macklin, Speer, Hanan & McKernan, New York City, for Steers Sand & Gravel Corp.

Emery, Langan & Lamb, Jersey City, N. J., for Harrison Supply Co.

SMITH, District Judge.

This is a suit in admiralty. The claim of the libellants is for the damage to the Clay Street Bridge, of which they are admittedly the owners. The Motor Tug Chancellor, Inc., as owners of the Tug Chancellor, filed a claim and answer and thereafter impleaded the Scow H.S. 89 and its owner, Steers Sand & Gravel Corporation, and the Harrison Supply Company. The claim for damage in the amount of $7,175 is admitted, and the only issue presented for determination is that of liability.

## Facts

### I.

The Clay Street Bridge is a drawbridge of the swing type and spans the Passaic River. The channel is approximately 300 feet in width, but at the locus in quo the fairway is considerably less because of the presence of the bridge structure, which consists of a middle pier and two quarter piers. The middle pier is 64 feet in width and each of its abutments extends mid-channel approximately 130 feet. Each of the quarter piers, located along the easterly and westerly shores, is 80 feet in length and projects approximately 47 feet into the channel. Each of the fairways, under the easterly and westerly draws, is approximately 75 feet in width.

### II.

The respondent Harrison Supply Company owns and maintains a dock which extends 240 feet along the easterly shore of the river immediately south of the quarter pier. The outer edge of the dock abuts upon the easterly bulkhead line. It should be noted that at this point the easterly boundary of the channel is within several feet of the bulkhead line.

### III.

The respondent Steers Sand & Gravel Corporation was the owner of the Scow H.S. 89, which was delivered at the dock of the Harrison Supply Company on the morning of February 5, 1951. The delivery was accepted and thereafter the Harrison Supply Company assumed custody and control of the vessel. The bargee, an employee of the Steers Sand & Gravel Corporation, left the H.S. 89 at two o'clock in the afternoon and did not return until the following day.

## IV.

When the Scow H.S. 89 was delivered, another scow, the Josephine Waldie, was moored at the dock, its stern upstream, north, and opposite the end of the southerly abutment of the middle pier; this scow was against the dock, and its stern was approximately 100 feet, more or less, from the easterly quarter pier. The tug which made the delivery moored the H.S. 89 alongside of the Josephine Waldie and in a similar position, its stern upstream and opposite the end of the southerly abutment of the middle pier. The scows had an overall width of 70 feet and, as thus moored, extended beyond the quarter pier an additional 20 feet into the fairway so as to obstruct the entrance to the easterly draw of the bridge.

## V.

The employees of the Harrison Supply Company, early in the afternoon of the same day, moved the Scow H.S. 89 and moored it at the dock, where it was partially unloaded. At the end of their working day, approximately five o'clock, these employees again moved the Scow H.S. 89 and moored it alongside of the Joesphine Waldie in the position hereinabove described. The scows were in the same position, Without Lights, when the collision hereinafter described occurred.

## VI.

On February 6, 1951, at approximately four o'clock in the morning, the motor tug Chancellor, with a loaded oil barge in tow and lashed to its port side, was proceeding north in the Passaic River. The weather was clear, there was no moon, and the night was dark; there was a flood tide of approximately one knot. The tug was 76 feet long and 21 feet wide, the barge was 208 feet long and 40 feet wide, and the stern of the tug was approximately 12 feet abaft the stern of the barge. The tow had an overall length of 220 feet and an overall width of 61 feet. A lookout was stationed on the bow of the barge.

## VII.

The tow passed through the easterly draw of the Lackawanna Bridge, approximately 1000 feet, more or less, south of the Clay Street Bridge. The tug held the tow to starboard and set her course to the easterly draw of the Clay Street Bridge. After the customary exchange of signals between the tug and the bridge, the tug, moving at half speed, was headed toward the easterly draw. The bridge attendants, having observed the course of the tow, swung the easterly draw of the bridge upstream.

## VIII.

When the tow was approximately 300 feet from the bridge, the lookout observed the scows moored, Without Lights, at the dock of the Harrison Supply Company; he first observed the Josephine Waldie, which was against the dock and high in the water, and a moment later observed the H.S. 89, which was alongside the Josephine Waldie and low in the water. The lookout shouted a warning to the captain of the tug, who promptly stopped his motors and turned on a searchlight; the searchlight was apparently of no assistance because of the reflection from the water. The captain thereupon reversed the motors in an effort to check the headway of the tow; this maneuver failed because the tug was unable to gain sternway. The captain then started the motors forward in an effort "to straighten" the tow. Despite the efforts of the captain to avoid collision, the bow of the oil barge "fetched up against" the abutment of the middle pier, and as the tow swung to starboard the starboard side of the Chancellor "fetched up against" the scows. The force of the impact then threw the bow of the barge against the quarter pier.

### Discussion

■ The Scow H.S. 89, although owned by the Steers Sand & Gravel Company, had been delivered to the Harrison Supply Company, and at the time of the collision, and for a full day prior

thereto, was in its possession and under its exclusive control. See Palmer v. Agwilines, 135 F.2d 689, 691; Roah Hook Brick Co. v. Erie R. Co., 179 F.2d 601, 604. The Harrison Supply Company, having accepted delivery and assumed control of the scow, was liable for any damage chargeable to its fault. Jova Brick Works v. City of New York, 2 Cir., 277 F. 180. The Steers Sand & Gravel Company must therefore be exonerated.

■■ The generally accepted standards of maritime safety imposed upon the Harrison Supply Company a duty to moor the scows in such a manner as to prevent any foreseeable hazard to navigation. These standards imposed upon the Harrison Supply Company a duty to moor the scows in a reasonably safe position so as not to obstruct the fairway, particularly at the entrance to the draw. 33 U.S.C.A. § 409; see also the cases hereinafter cited. Where, as here, the scows were moored at night in the manner hereinabove described, these standards imposed upon the Harrison Supply Company a further duty to properly light the scows as a warning to other vessels. 33 U.S.C.A. § 221; see also the cases hereinafter cited.

■■ The respondent was guilty of a reckless violation of the ordinary standards of safety. The scows admittedly did not carry lights and were so moored as to obstruct the fairway at the entrance to the easterly draw. The presence of the H.S. 89 in the fairway at the entrance to the draw created such an obvious peril to navigation that her failure to carry lights was inexcusable. The creation of the hazard by the respondent was negligence and in our opinion, this negligence was the sole cause of the collision. See The Kennebec, 2 Cir., 108 F. 300; The Millville, D.C., 137 F. 974; Petition of Cahill Towing Line, 2 Cir., 22 F.2d 273; The Frank, 2 Cir., 40 F.2d 430; The Jumping Jack, 2 Cir., 55 F.2d 925. The crew of the Chancellor, suddenly confronted by a danger of which it had no warning, did all that was possible to avoid the collision which was then imminent.

■ The respondent contends that the Chancellor should have passed through the westerly draw and that its failure to do so was negligence. It is argued that the use of the westerly draw was common practice. The contention, however, ignores the express provisions of Section 210 of Title 33 U.S.C.A., which provides: "In narrow channels every steam vessel shall, *when it is safe and practicable,* keep to that side of the fairway or mid-channel which lies on the starboard side of such vessel." (Emphasis by the Court.) The captain of the Chancellor, in compliance with the rule, held the tow to starboard and set her course to the easterly draw. He had no notice or warning of the obstruction in the fairway and he therefore had a right to assume that his course was "safe and practicable." We are of the opinion that under these circumstances the Chancellor cannot be charged with culpable negligence.

The respondent further contends that the Chancellor should have stopped and reversed when the H.S. 89 was sighted. This contention seems to ignore the circumstances which preceded the collision. When the H.S. 89 was first sighted the Chancellor was already in a position of danger, and, as the captain testified, her headway could not have been checked in less than a half minute; in fact, when the motors were reversed the bow of the barge swung to starboard, in the general direction of the scows, and it was then necessary to straighten the tow. It further appears from the undisputed testimony of the captain that any attempt to gain sternway would have swung the tow "all the way around." When it is remembered that the overall length of the tow was 220 feet, it seems obvious that the maneuver would not have prevented a collision with the scows.

■■ The captain of the Chancellor was required to exercise ordinary care and skill in the navigation of the tow. We are of the opinion, particularly in the absence of any persuasive evidence to the contrary, that his navigation of the tow met this requirement. If the captain was guilty of an error of judg-

ment, and we are not convinced that he was, it was an error of judgment in extremis and not negligence.

The respondent, in an effort to avoid the consequence of its negligence, is hypercritical of the captain's navigation of the Chancellor. The rule of The City of New York, 147 U.S. 72, 13 S.Ct. 211, 37 L.Ed. 84, seems apposite. It is therein stated, 147 U.S. at page 85, 13 S.Ct. at page 216: "Where fault on the part of one vessel is established by uncontradicted testimony, and such fault is, of itself, sufficient to account for the disaster, it is not enough for such vessel to raise a doubt with regard to the management of the other vessel. There is some presumption at least adverse to its claim, and any reasonable doubt with regard to the propriety of the conduct of such other vessel should be resolved in its favor." See also The Mamei, 3 Cir., 152 F.2d 924, 930, and the cases therein cited.

### Conclusion

The libellants are entitled to judgment against the respondent Harrison Supply Company and in the full amount of their claim, to wit, $7,175. The other respondents are not liable for the reasons hereinabove stated, and are therefore exonerated.