## THE GRANITE STATE.

1. Where the question of fault in a collision lies, on the one hand, between a boat fast at a wharf, out of the track of other vessels, and moored, in all respects of place and signals, or want of them, according to the port regulations of the place, and, on the other, a steamer navigating a channel of sufficient width for her to move and stop at pleasure, the fault, under almost any circumstances, where there is no unusual action of the elements or other superior force driving her to the place of collision, will be held to be with the steamer.

Hence a steamer which, in going in the dark from a broad channel into her dock, runs—though in an effort to avoid other steamers coming out of *their* docks—against a barge moored at a wharf according to the port regulations, is responsible for the collision. Nor is it an excuse that the barge was without masts, lay low, and owing to her color was not

visible in the dark till you were close by her; nor, if the port regulations of the place do not require them from vessels moored at wharves, that she was without both light and watch. ·

2. The sum which it will take to repair her is not an incorrect rule of damage, in case of injury from collision to an old barge of a peculiar structure and capacities of usefulness, and from these causes not having any established market value in the particular port where she is injured.

THE steamer Granite State, plying between Hartford and New York, arrived before daybreak of a December morning in the Hudson, with passengers and freight, and was in the act of entering her dock between the city piers Nos. 24 and 25. *Across* the end of Pier No. 23 lay an old and pretty rotten barge,—the Ranger. The barge's pier extended many feet further out in the river than the piers in the immediate vicinity above and below. The barge had no masts, and her hull lay below the top of the pier; that is to say, the pier was higher than the vessel, as she lay in front of it. She was well secured in her place, but had on board no watch or light; the laws of the port of New York, as was proved, not making it obligatory on vessels of this sort *moored at wharves* to have either, though vessels at the wharves not unfrequently had them both. The barge had been taking in loading from the dock; but the night coming on before she was fully laden, she lay where she was to complete her cargo in the morning. Her deck was covered with some old and dirty linen of a yellowish hue, and not unlike the color of the wharf at which she lay. By the rules of the port she had a right to be where she was. The morning was dark and rainy, and a pretty strong wind from the southeast; the tide the last of the ebb. The steamer came down on the Brooklyn side, and at about the usual point swung round towards the New York shore, and straightened up with a view to work into her berth. As she was approaching it, a *Williamsburg* ferry-boat came out of *her* slip, which was between Piers Nos. 25 and 26, the next above the berth of the steamer. The Granite State stopped and backed obliquely into the stream. At this moment, out shot from her slip, between Piers Nos. 21 and 22—below where the

barge lay—a *third* steamer, a *Fulton* ferry-boat. To avoid *her*, the Granite State, being now clear of the other ferry-boat, went "strong ahead," so as to get into her slip as fast as possible. Suddenly she discovered the barge, but not until she was within sixty feet of it; too late to arrest her headway, under more or less force of which, notwithstanding an abundant use of her "gingle-bell," "gong," &c., she came upon the barge, cutting her down with every paddle, so that the old hull drifted out and sank. The steamer had a bright light upon her, and her officers and hands were on deck, attending, apparently, by their presence at least and general observation, to their duty.

The owners of the barge now libelled the Granite State in the District Court for New York. The usual conflict existed among the witnesses of the two boats; some swearing that the steamer's own light would have revealed the barge, if good observation had been kept; some that the steamer should have reversed her engine instead of pushing "strong forward" as she did; some that she should have ported, and others that she should have starboarded her helm, &c.

The District Court, in view of the fact that the barge had a right to be where she was and was not bound to have a watch or light, decreed for the libellant and referred it to a commissioner to assess damages. The commissioner fixed the value of the barge at $850, assuming apparently that she was *worth this sum to her owners;* though he stated that having been built for a special and unusual purpose, and being unlike every other sort of craft used in the port of New York he had difficulty in forming any estimate. The difficulty, in truth, was obvious: some witnesses swearing that the boat was not worth having for a gift; others that she was worth eight or ten dollars; and others that in her former condition she could be made practically very useful. There was conflict in the testimony here as in the other part of the case. This report was set aside, and a new estimate directed. On new evidence the commissioner gave $150 more. This report, too, was set aside, and a third reference ordered; the court directing the commissioner to consider

the actual cost of raising and repairing the barge and so putting her as near as could be into her former state. A report made on this basis was confirmed. The case was then taken to the Circuit Court.

The Circuit Court—taking into view the position of the barge at the end of the dock, undistinguishable, in a dark and rainy night, from the end of the dock itself, and with neither watch nor light on it to give notice of its position—thought that it was no fault of the Granite State that she did not discover the barge earlier than she did, and when it was too late to avoid the collision. That court did not consider that the barge was in fault, so as to subject her to a portion of the damages if the Granite State had been found also in fault; but thought that, so far as a watch or a light might have facilitated the discovery of her by the approaching vessel, the omission to have one was a matter properly entering into and influencing the judgment of the court upon the question of negligence on the part of the steamer, and that to this extent the barge was obliged to assume the responsibility of the omission.

It decreed accordingly, reversing the District Court.

The case was now here for review, and was argued *by Mr. Benedict, for the owners of the barge, and by Mr. Owen, contra, for those of the steamer.*

Mr. Justice GRIER delivered the opinion of the court.

It is not controverted, that the barge, which was fastened to the end of the pier, was in a place she was entitled to occupy; that she was not required to have a light suspended during the night time, as vessels anchored in the channel are required; nor to have a watch kept on board to warn off steamboats using the channel of the river. She was not on any track the steamer was required to take; and, being incapable of motion, cannot be justly charged with any participation or fault in causing the collision.

As in the case of *The Louisiana*, recently decided,* there

---

* *Supra*, p. 164.

was no unusual convulsion of the elements or sudden hurricane which nautical men could not anticipate; no *vis major*, causing a collision which a proper display of nautical skill might not have prevented.

Under such circumstances we are not called upon to inquire wherein the steamboat was not managed with proper nautical skill; whether the bright light which the steamboat had, or ought to have had, was not sufficient to warn her in time of her proximity to the pier if careful watch had been kept; whether she should not have backed her engine instead of rushing forward; whether she should have ported or starboarded her helm. All these inquiries are superfluous where the collision was caused by a vessel having the power to move or stop at pleasure in a channel of sufficient breadth, without any superior force compelling her to the place of collision. The fact that in these circumstances the steamboat did collide with the barge is conclusive evidence that she was not properly managed, and that she should be condemned to pay the damages caused by the collision.

There seems to have been some controversy in the District Court as to the measure of damages. No less than three different reports were made by the master on the subject. The parties have no right to complain of the instructions or opinions delivered by the court. There cannot be an established market value for barges, boats, and other articles of that description, as in cases of grain, cotton, or stock. The value of such a boat depends upon the accidents of its form, age, and materials; and as these differ in each individual there could be no established market value. A person may make considerable profits by the use of an old hulk of little value in the market for vessels. His loss cannot be measured by the ratio of her profits, as he might supply himself with another at a much cheaper rate. But when the injured vessel is not a total loss, and is capable of being repaired and restored to her original situation, the cost necessary to such repair cannot be said to be an incorrect rule of damages.

We do not feel called upon to decide between the opinions of witnesses who have given their guesses on the subject of

the value of this rotten hull; and we see no reason to doubt the correctness of the decision of the district judge on the subject.

The judgment of the Circuit Court must be therefore reversed, and the judgment of the District Court affirmed with costs.

DECREE ACCORDINGLY.