## THE LONDON ASSURANCE v. COMPANHIA DE MOAGENS DO BAR- REIRO.

(Circuit Court of Appeals, Third Circuit.  May 14, 1895.)

No. 6.

1. MARINE INSURANCE—PARTICULAR AVERAGE CLAUSE—EFFECT OF COLLISION.
An exception in the words, "Free of particular average unless the vessel be sunk, burned, stranded, or in collision," ceases to operate as soon as a collision has occurred; and the insurer is liable for subsequent loss, whether the same resulted from the collision or not.  56 Fed. 44, affirmed.

2. SAME—"COLLISION" DEFINED.
Where a policy contained the words, "Free of particular average unless the vessel be sunk, burned, stranded, or in collision," *held*, that there was a "collision," within the meaning thereof, where the vessel, after being completely loaded and casting off her moorings, was made fast again to the wharf, because of a difficulty with her engines, and was there run into by a scow, in tow of a tug boat, which made a substantial break in her bulwarks.

3. SAME—DAMAGE TO CARGO—BREAKING UP OF VOYAGE—ADJUSTMENT OF LOSS.
A vessel bound from New York to Lisbon, with a cargo of wheat, was compelled to put into Boston harbor, because of a protracted storm, where her cargo was found to be so damaged by water that it could not be restored to a merchantable condition, and it was accordingly sold at that place.  In an action against the insurers of the cargo, it was shown that, owing to peculiar conditions in Portugal, damaged wheat was unsalable there.  *Held*, that the sale at Boston must be regarded as made from necessity for the benefit of all concerned, and that the insurer was liable as upon a salvage loss for the difference between the valuation in the policy and the sum realized.

Appeal from the District Court of the United States for the Eastern District of Pennsylvania.

This was a libel by the Companhia De Moagens Do Barreiro against the London Assurance, a corporation, to recover upon a policy of insurance for damage to a cargo of wheat shipped on board the steamer Liscard.  The cause was tried in the district court, together with another libel by the same company against the Manheim Insurance Company, upon a similar policy.  Decrees were entered in favor of the libelant in each case.  56 Fed. 44.  An appeal was taken by the London Assurance, a stipulation having been filed that the other case should abide the event of this one.

W. W. MacFarland and Wm. Parkin, for appellant.

John F. Lewis, for appellee.

Before ACHESON and DALLAS, Circuit Judges, and BUF- FINGTON, District Judge.

ACHESON, Circuit Judge.  This is an appeal by the London Assurance, a corporation of the kingdom of Great Britain, the respondent in the court below, from a decree of the district court, sitting in admiralty, in a suit on a policy of marine insurance.  The material facts as disclosed by the record are these:  On the 10th of December, 1890, the London Assurance insured for the libelants

$20,000 on 33,000 bushels of wheat, the property of the libelants, valued at $40,887, shipped on board of the steamship Liscard, in the port of New York, for a voyage "at and from New York to Lisbon, Portugal." A policy in the usual form and a short certificate, taken together, constituted the contract of insurance. The policy, by its terms, covers all losses and damages by the perils of the sea, but the certificate contains the memorandum: "Free of particular average unless the vessel be sunk, burned, stranded, or in collision." The policy provides that the risk shall begin "upon the said goods and merchandises from and immediately following the loading thereof on board of the said vessel," and shall continue until the same shall be safely landed at the port of destination. The libelants shipped upon the Liscard, for the same voyage, other lots of wheat, which were insured in other companies, upon the like terms and conditions. The loading of the wheat here in question and of the entire cargo on board the Liscard was completed, and her bills of lading were signed and delivered to the libelants, by December 11th. On the next day, December 12th, the ship was unmoored for the purpose of starting on her voyage; but, on account of some trifling derangement of the engines, they would not work, and therefore the ship was made fast again to the wharf. After she was remoored, on the evening of the same day, shortly after 8 o'clock, the Liscard was run into by a scow or lighter in tow of the tug George Carnie. By this collision a break was made in the bulwark or inclosed iron side of the Liscard above her deck. The break was a continuous one in two of the iron plates of the bulwark, was eleven feet long, and for most of its length was open a width of from one-half inch to one and a half inches. The bulwark was an important part of the vessel, essential in her design and construction, and intended to keep the water off her deck and hatches. A claim upon the tug and scow for damages sustained by the collision was made by the master of the Liscard, and the sum of $250 was paid in settlement. After the collision, and before starting on her voyage, the vessel was surveyed and pronounced seaworthy. The Liscard finally left New York on December 15th. In the course of her voyage, the vessel encountered very bad weather,—"gales and hurricanes,"— which lasted eight days, and by the excessive straining of the ship opened the seams of the deck, admitting water to the cargo; and in that way, and also by water going down the hatchways, from which the canvas coverings were swept by the storm, the wheat was injured. On December 24th the vessel put into Boston Bay in distress. At Boston the cargo was discharged into lighters for examination, and was found to be badly damaged by sea water, and unfit for reshipment in its then condition. A survey made January 16, 1891, recommended that the entire cargo be sold for the benefit of all concerned. Later surveys reported the wheat to be in an improved condition, in consequence of the judicious treatment to which it had been subjected. But by the last survey, which was made on February 28, 1891, and from other evidence, it appears that none of the wheat had been restored to a first-rate condition. Even

the part reported by that survey as in "fair merchantable condition" was "slightly damp," and had a "slight smell."    About one-half of the wheat remained in a seriously damaged state, a great part of it beyond remedy, and some was practically worthless.    On February 20th all the underwriters on the cargo (including the London Assurance) agreed in writing that the payment of $3,600 freight on the damaged cargo, "and the acceptance and sale of said cargo" by the owners, should be "without prejudice to any of the rights or claims the shippers or owners of the cargo may have against the insurers of said cargo, and 'shall not be considered a waiver or an acceptance of an abandonment,' and shall be without prejudice to any defense that the insurers of the cargo may have under their contract of insurance."    On February 27th the agents of the ship entered into an agreement with the agents of the owners of the cargo to terminate the voyage, and surrender the cargo to the owners, in consideration of the payment by them of $3,600, as full freight, and this agreement was carried out.  Shortly thereafter the owners of the cargo sold the greater part of the wheat at Boston, and a small portion, which could not be disposed of there, was taken to New York, and sold.

The first question with which we have to deal arises upon the memorandum clause:  "Free of particular average unless the vessel be sunk, burned, stranded, or in collision."    This clause is of ancient origin, but originally was confined to the stranding of the ship. We learn from the elementary works on marine insurance that it was introduced into English policies, with respect to stranding, as early as the year 1749.    Afterwards it was extended so as to cover other casualties to the ship besides stranding.    The clause, "Free from average unless general, or the ship be stranded," was first judicially considered in 1754. curiously enough, in an action against the present appellant (Cantillon v. London Assurance Co., cited in 3 Burrows, 1553), where it was held that these words amounted to a condition, and that, upon the ship's being stranded, the insured was let in to claim his whole partial loss.    The London Assurance Company then struck the clause out of its policies, but has since reinserted it.  Marsh. Ins. 140; 1 Pars. Mar. Ins. 629, note 3.    The meaning and effect of the clause were finally settled in 1797, in the leading case of Burnett v. Kensington, 7 Durn. & E. (7 Term. R.) 210, where the whole court of king's bench, after the fullest argument and upon great consideration, determined that a stranding destroys the exception in the memorandum, and lets in the general words of the policy; and that, therefore, where the ship has been stranded, the insurer is liable for any partial loss sustained by any of the articles mentioned in the memorandum, although such loss did not arise from the stranding, but solely from another cause.    Marsh. Ins. 151. This has been the accepted doctrine ever since that adjudication. All the text-book writers agree that this is the well-settled construction of the clause, and that if the ship be stranded while the memorandum articles are on board, and during the continuance of the risk, then the underwriter is liable to pay all particular average losses, although they may have taken place at a different time,

from a different cause, and at a different place. Marsh. Ins., supra; 2 Arn. Ins. 795; McArthur, Ins. 285; 1 Pars. Mar. Ins. 630, 631. It is true that Mr. Parsons criticises the grounds upon which this construction rests, and, while stating that it is the established law of England, suggests that some question exists whether the same construction would be given to the clause in this country. There has been, however, no American decision in conflict with the English doctrine; and a departure from that principle by our courts, we think, would be unwise. As was said by Mr. Justice Gray in Norrington v. Wright, 115 U. S. 188, 206, 6 Sup. Ct. 12: "A diversity in the law, as administered on the two sides of the Atlantic, concerning the interpretation and effect of commercial contracts of this kind, is greatly to be deprecated."

Moreover, if the parties to a contract of insurance mean that the insurer shall be liable for partial losses only when they are occasioned by the specified casualties, nothing is easier than to give expression to that intention. Thus, we find from the evidence that in Philadelphia, where this insurance was effected, marine underwriters employ two different clauses respecting particular average losses, to vary the risk as may be agreed on. One of these clauses is that used in this instance; the other is in these words: "Free of particular average unless caused by stranding, sinking, burning, or collision." It cannot be doubted that the parties to the contract in suit intelligently adopted the form which omits the "caused-by" limitation.

It is a sound principle of interpretation that words whose meaning has been defined by the law or fixed by judicial decision will be presumed to have been used in that sense. 2 Pars. Cont. *501, note t; Doebler's Appeal, 64 Pa. St. 9, 15. That principle should have full sway here. If this is not to be regarded as a contract subject in all respects to the law of England, by reason of the fact that the policy and certificate were issued in Philadelphia by a local agency of the insurance company, still the company is an English corporation, and the certificate of insurance provides that any loss "shall be reported to the corporation in London," and shall be paid there, and that claims shall be adjusted according to "the usages of Lloyds"; and the certificate contains a notice that "to conform with the revenue laws of Great Britain," in order to collect a claim thereunder, "it must be stamped within ten days after its receipt in the United Kingdom." Now, the words here involved are the words of this corporation, and it may reasonably be assumed that they were used in the sense given to them by the English law. Furthermore, if an exception in a policy of insurance be capable of two interpretations equally reasonable, that one must be adopted which is most favorable to the insured. Insurance Co. v. Cropper, 32 Pa. St. 351; First Nat. Bank v. Hartford Fire Ins. Co., 95 U. S. 673, 679. In the latter case the court said in reference to the insurance company:

"It is its language which the court is invited to interpret, and it is both reasonable and just that its own words should be construed most strongly against itself."

From whatever point of view, then, the subject is regarded, we think that the court below was right in construing the particular average clause of the contract in accordance with the English doctrine.

Was, then, the Liscard "in collision," within the meaning of the contract of insurance? We think that she was. Undoubtedly, in an admiralty sense, there was a collision, notwithstanding the fact that the Liscard was at rest and moored when she was run into. The Granite State, 3 Wall. 310.

Now, with respect to stranding, Mr. Parsons (1 Mar. Ins. 632) says:

"Both in England and in this country it seems to be settled that, if the ship be literally stranded, that is enough, without much reference to the length of time that she remains on shore, or any regard to the effect of this stoppage."

Thus, in Harman v. Vaux, 3 Camp. 429, Lord Ellenborough, C. J., said:

"If the ship touches and runs, the circumstance is not to be regarded. There she is never in a quiescent state. But if she is forced ashore, or is driven on a bank, and remains for any time on the ground, this is a stranding, without reference to the degree of damage she thereby sustains." -

Certainly, the same effect must be given to the particular average clause, whether the case before the court be one of stranding or of collision. The two casualties are alike, in that all the evil effects to a vessel from the disaster oftentimes are not at once evident. In this instance there was an actual collision, resulting in substantial injury to the vessel. True, the injury was not such as to affect the seaworthiness of the ship. She was still in a fit state to encounter the ordinary perils of the contemplated voyage. The particular average clause, however, is silent as to the extent of the injury to the vessel. The words "unless the vessel be * * * in collision" exclude other conditions. Therefore, also, it is immaterial whether or not the collision contributed to the ultimate partial loss to the cargo. The very purpose of the clause, all the adjudged cases declare, is to exclude such an inquiry, which always is attended with difficulties, and often must end in uncertainty. Upon this very point there is here a conflict of proof. There is some evidence tending to show that, during the tempestuous weather the Liscard encountered, some water did come on deck through the broken plates in the bulwark, and reached the cargo; and at least one seafaring witness, of great practical experience, expresses the opinion that a large quantity of water in a gale, accompanied by high seas, would go through the break in the ship's bulwark caused by the collision. But it is not necessary to determine the question whether any damage to the wheat was due to the break. The fact of collision, like the simple fact of stranding, fulfills the condition of the particular average clause, which then ceases to have any operation. The circumstance that the collision occurred before the Liscard actually started on her voyage is of no moment. The insurance had attached before the collision. That is the decisive fact. By the terms of the contract, the adventure with respect to the wheat began as soon as it was put

on board the vessel. The effect of the collision, then, under the particular average clause, was the same as if it had taken place in mid-ocean.

The views we have expressed are entirely harmonious with the rulings in Roux v. Salvador, 1 Bing. N. C. 526, and Insurance Co. v. Pitts [1893] 1 Q. B. 476, cited by the appellant. In the former of these cases the stranding did not occur until after the hides had been landed and sold, and the risk of the underwriters thereon had thus ceased, by the act of the insured. In the latter case, at the time of the stranding of the ship, the maize was not on her, nor at her risk at all. Indeed, the ship's voyage, with respect to the maize, began afterwards. In each of these cases the court recognized the binding authority of Burnett v. Kensington, supra.

In Insurance Co. v. Pitts, which was decided so late as the year 1893, Collins, J., said:

"If the stranding takes place within the time contemplated by the parties, the insured can recover in respect of a particular average loss, whether the damage can be traced to the particular stranding or not."

Nor do we think that our conclusion that the Liscard was "in collision," within the meaning of the contract in suit, is inconsistent with the ruling in the case of The Glenlivet, Prob. Div. (1893) 164; same case, on appeal, Prob. Div. (1894) 48. There the English court of appeal, in affirming the judgment of the trial judge, without approving his reasoning, decided merely that where slight fires occurred in the coal in the bunkers of an iron ship, which were put out by pumping water on the coal, and some injury was done by the heat to the ship's plating and otherwise, the ship was not "burnt," within the meaning of that term, as used in the memorandum in the policy.

We pass now to the consideration of the question of the adjustment of the loss. This matter is thus presented in the appellant's second specification of error, namely:

"(2) The commissioner reported that the voyage was broken up at Boston, for the benefit of all concerned, including the underwriters; that the libelant's adventure was practically frustrated, and therefore justifiably abandoned; that, if the cargo had been reshipped to Lisbon, the loss would have been much greater than it has proved, and the underwriters worse off than now, and that they would have been obliged to pay the difference between the price for which the damaged grain sold and the value of sound grain in Lisbon proportioned to the valuation in the policy; that the amount they would have been called upon to pay would have been greater than the difference between the value of the cargo, as stated in the policy, and the amount for which it was sold in Boston. And the commissioner reported that the respondent was liable for this difference, and adjusted the loss under the policy as a salvage loss, instead of as a particular average. The respondent excepted to these several findings, and to this adjustment of the loss, and to the commissioner's refusal to adjust the loss as a particular average, with Boston as the port of the destination, and the sales made there as determining the percentage of deterioration for which the underwriters were liable. The court overruled the exception, and the respondent specifies such action of the court as error."

We have carefully examined the evidence and the legal authorities cited, and are not convinced that the commissioner, erred either in his findings of fact or in his method of estimating the loss on the cargo. The breaking up of the voyage and the sale of the cargo at the port of distress, were not for the benefit of the insured solely. What was thus done was really for the advantage of all persons interested, including the underwriters. As we have already seen, the wheat was all more or less damaged. Now, it appears that the condition of affairs in Portugal with respect to the importation of wheat is peculiar, and that damaged grain is unsalable there. The finding of the commissioner is that the Liscard's wheat would have been almost valueless at Lisbon. The evidence certainly warrants the conclusion that the loss to the appellant would have been greater had the cargo gone on to Lisbon. We agree with the commissioner and the court below in the view that the adventure was practically frustrated, and hence justifiably abandoned; and that, under the special circumstances, the sale of the wheat at Boston may fairly be considered to have been made from necessity for the benefit of all concerned.

Mr. Parsons (2 Mar. Ins. 411) says that, if a ship at an intermediate port finds a part of its cargo so injured by sea damage that it is unfit to be carried on, it may be sold at that port, and the loss adjusted as a salvage loss.

Mr. Phillips (2 Ins. § 1480) says, speaking of an adjustment as upon a salvage loss:

"The underwriter is liable for such an adjustment of a particular average only in cases where the sale at an intermediate port is obviously expedient, and made on account of damage by the perils insured against; where, if the subject were forwarded to the port of destination, it would be greatly diminished in value, or be of no value, on arriving there."

We think that the present case falls within the rule even as thus laid down, and that the appellant is justly chargeable with the difference between the valuation in the policy and the sum realized by the sale, and that the adjustment upon that basis was correct.

The specifications relating to some allowances under the sue and labor clause of the policy do not require extended discussion. We have looked into these matters, and our judgment is that the appellant has here no reasonable cause of complaint. Nor do we discover that any injustice was done to the appellant in the allowance of interest from December 15, 1891, on the libelants' claim.

We see no error in the conclusions of the district court, and therefore its decree is affirmed.