**FORD MOTOR CO. v. BRADLEY TRANSP. CO.**

Civil Action No. 471.

District Court, E. D. Michigan, N. D.

June 3, 1947.

Additional Opinion Oct. 24, 1947.

Foster, Lott & Lutz and Charles J. Fellrath, all of Detroit, Mich., for plaintiff.

Beaumont, Smith & Harris, of Detroit, Mich., for defendant.

PICARD, District Judge.

This is an action to recover damages admittedly incurred when a Hulett unloader on the Ford dock at the River Rouge plant was toppled over, allegedly due solely to negligence of defendant.

On the night of November 29—30, 1944, defendant's steamer, the Carl D. Bradley, had finished unloading stone at the Ford dock which runs in a generally northerly and southerly direction at the Ford River Rouge plant and is located on the east side of a slip. The over-all length of the Bradley is 638 feet 9 inches, its moulded breadth 65 feet. The slip to the north is a dead end but at the south there is considerable open water and vessels unable to turn around in the slip usually back up or are pulled or pushed from the slip to the open water turning basin, turn and head out through River Rouge to the Great Lakes. This slip is 250 feet wide. The length of the dock from the inner bulkhead to the back turn is 2594 feet and on the night in question the bow of the Bradley was apparently a considerable distance south of the tool crib which is 1057 feet from the north end of the dock. Her stern was near or aft of two Hulett unloaders which had been placed on the dock about 75 to 150 feet apart. Some of plaintiff's witnesses stated that they were at the tool crib and when the Bradley started backing out they walked south and towards the north Hulett.

The Bradley, a self-unloader, had completed unloading its stone about 11:15 p. m. and the accident happened at about 11:25 p. m. while the vessel was moving backwards, partly and intermittently under its own power and that of the tug Oregon that had been engaged for the purpose of maneuvering the Bradley back to the turning basin.

The Hulett is a large piece of equipment and spans or arches a macadam road, three sets of railroad tracks and a fence.

It stands 80 feet from ground to top, weighs 550 tons, and is between 27 and 28 feet wide. From the ground to the lower part of the Hulett, as it arches over the road and tracks, is 19 feet in height for a distance of about 70 feet in length. Near the edge of the dock are two rails closely spaced together on which the trucks of the westerly upright supporting legs of the Hulett rested and traveled. East of this is a railroad track, a macadam road 18 feet wide, another railroad track, a steel wire fence and then another track. The back end of the Huletts also ran on closely spaced tracks which were on the wall about 15 feet up above the level of the road and east of that wall was a trough and open area where the ore and coal were deposited and stored. The south Hulett, involved in the accident, and the north Hulett, were as nearly identical as engineering construction could make them.

The extreme west end extension of the Hulett was approximately 31 feet 6 inches above the surface of the dock and set back 15½ inches from its edge. From the top surface of the dock to the water, on the night in question, was approximately 4 feet, and between the water and the dock top surface there was a wooden bumper consisting of a 12 inch by 12 inch timber which when new extended 8 inches beyond the concrete being imbedded 4 inches therein. The top surface of this bumper was 2 feet from the top surface of the dock. Admittedly this timber bumper had been worn by constant rubbing of the sides of vessels moored at the dock for unloading, although it was claimed by plaintiff that its maintenance crew had but recently replaced any timbers noticeably worn or broken.

Flood lights were located every 40 feet on the back wall, the efficacy of which is questioned by defendant. There were also flood lights on the ship.

The captain of the Bradley, one of the largest vessels on the Great Lakes, had been in that slip about ten times before and admittedly saw the Huletts when he came in that afternoon. He testified he could see their huge bulks looming up in the darkness when he was backing and being towed or pushed out by the small tug. A fairly strong or fresh wind (18 mph) was blowing from the west or northwest. The tug assisting the Bradley in backing down the slip was on the Bradley's left or port bow facing south and was emitting quite heavy smoke spasmodically. The Bradley successfully maneuvered by the north Hulett, clearing it two or three feet and was moving at the rate of one or one and a half miles per hour when as the widest flare of the Bradley's bow reached the vicinity of the south Hulett there were creaking, grinding, and groaning noises. Witnesses of plaintiff did not see the Bradley come in contact with the Hulett but testified that they did see the Hulett move and sway in a southerly direction along with the bow of the boat probably a distance of 8 or 10 feet. Then followed electric flashes from the hot rails at the back wall and east end of the Hulett and suddenly the Hulett, either because its progress was stopped by the coal unloader—another heavy piece of equipment left placed 8 or 10 feet south of the Hulett—or because its east end was wrenched off the rails, lost its support from its right leg and fell over in a northerly direction. The dock lights all went out and the top end of the Hulett after the crash extended about 8 feet out into the slip from the edge of the dock and what had been its northwest supporting leg was hanging over the dock's edge. Pieces of the rails close to the slip on which the Hulett traveled were broken out for a distance of 6 or 7 feet and the rear supports of the Hulett were toppled off the back wall.

After the accident there were marks on the top beading at the forecastle bulwarks along the starboard and on the starboard side of the vessel Bradley, the latter undoubtedly indicating where the Hulett had struck while falling. This contact was of sufficient force to break through the steel plating forcing the Bradley away from the dock.

Just prior to the crash, however, a train consisting of coal tender, engine and caboose, ran north on the track located just west of the fence. According to plaintiff's witnesses that train passed them when they were at least 50 feet north of the north Hulett because when the south Hulett fell

they claim they were at the stairs at the south side of the north Hulett. The train was going 10 to 15 miles per hour running backwards, with a headlight burning brightly on its north (back) end over the coal tender. The brakeman, Morgan, was standing on the tailboard on the north end of the tender and was facing north, the direction in which the train was backing. The headlight on the north end of the tender was similar in brightness to the regular locomotive headlight and according to witnesses the train proceeded north under the coal tower and the two Huletts.

While the Hulett was idle it was possible for a long cable to be so released that it would hang as far as the tracks and macadam road underneath, but all plaintiff witnesses deny this cable was hanging, and the brakeman, Morgan, said that if the cable had been hanging when he went under the Hulett he would have seen it. Neither he nor any member of the train crew felt any jerk and there was no evidence of damage to the train. The engineer and fireman admitted, however, that at the end of the run to the north where they stopped to fuel they got out and looked under the engine because somewhere along the road they had felt a roughness in the roadbed. They explained that they merely wanted to see if anything had happened to the engine. The engine itself was not in evidence, having been discarded or dismantled in May 1946, but a duplicate with measurements was available for the court's inspection.

The master of the ship shortly after the accident wrote in his log "our bow came in contact with the unloading rig, capsizing same"; and then in a report to the United States Marine inspectors "the bead trim on our vessel at the break of the forecastle deck on our starboard bow came in contact with one of the Hulett unloading rigs on the dock. The rig toppled over and struck our starboard side." The lookout on the Bradley said that he was on the starboard side when "I saw the vessel was about to hit Hulett, and barely had time to get out of way." The mate, reporting to the United States Coast Guard on December 6, 1944, said: "I noticed something sticking out that would contact Bradley's bow and

that we would not clear rig." One witness said that an unidentified person remarked that it was caused by that "God damn line hanging down."

Defendant's position is that plaintiff has not proved negligence on the part of defendant; that it is just as reasonable to suppose or conclude that the accident was caused by the train striking the cable hanging from the bottom of the Hulett as it is that the Bradley engaged the Hulett; that this is borne out by the fact that the Hulett fell to the north; that measurements on the construction of the Bradley proved that carrying the water ballast it was that night as indicated by its records the bead of the forecastle would be 2 feet 6 inches below the outermost projection of the Hulett and couldn't have engaged it; that all marks on the Bradley were made by the falling of the Hulett; that defendant's captain made a test on the 1st of October, 1946, and navigating approximately as he was that night determined that at no time could any part of the flare of the Bradley bow extend within 2 or 3 feet from the west edge of the Hulett; that if the wooden bumper had been maintained properly it would have been a physical impossibility for any part of the Bradley to touch the Hulett when its stern was 15 to 20 feet out from the dock as it was at the time the Hulett toppled over; and that with frame 27 resting against the dock and no bumper strake at all he couldn't get to within 18 inches of the Hulett. Defendant further claims that plaintiff had knowledge of the Bradley's flare and for this reason the Hulett should have been moved out of danger as was the custom on the Great Lakes; that the coal tower shouldn't have been left so close to the Hulett; that it was negligence on the part of the plaintiff, Ford Motor Company, to require boats to go into such a narrow slip; that there were no lights on the Hulett; that the lights on the dock back wall were inadequate; that the presence of the Huletts, locked as they were and thus rendered immovable, was a menace and a negligent act; and even though the captain of the Bradley was negligent, which it denies, plaintiff was guilty of either gross, contributory, concurrent or continuing negligence.

Plaintiff contends that defendant's captain was familiar with the slip; knew the Huletts and coal tower were there; saw them as he was backing out but maneuvered or permitted his vessel to be maneuvered negligently; that defendant is negligent as a matter of law; that defendant's captain should have known that the flare of his vessel would extend over the dock; sought to prove by statistics and experiments that when the Bradley was being propelled towards the south with its bow flush against the dock and its stern out 25 feet that even allowing for a full 8 inch wooden bumper that part of the bow between frames 25 and 27 would extend over the concrete dock at least 22 inches; with its stern out 15 feet from the dock the overhang was 16 inches; that the bead on the forecastle would then be directly opposite the extreme end of the Hulett; that the master should have known this; that if the captain had wanted the Huletts moved he should have so requested and they would have been moved; that there can be no negligence, contributory or otherwise, on the part of plaintiff and that if the court should so hold that then such negligence should have been discovered by defendant. It also states that defendant sought to mislead the court by its alleged experiment and that the idea of the train causing the accident was an afterthought with absolutely no foundation.

### Findings of Fact.

The court visited the scene of the accident by consent of attorneys for both parties and after hearing testimony and analyzing the exhibits has arrived at the conclusion that it was the Bradley, not the train, that toppled the Hulett over.

Being impressed with the sincerity and truthfulness of plaintiff's witnesses we can arrive at no other conclusion, since to hold otherwise we would be obligated to disbelieve practically all of them as well as all logic. We believe that the train, consisting of a coal tender, caboose and engine, going at the maximum rate of 15 miles per hour couldn't have pulled over that Hulett without some of those witnesses being aware of what was happening, that it is apparent to this court that if the train had caught the cable it could not have passed the workmen 50 feet beyond the north Hulett and those same workmen would not have had time to walk the 50 feet or more, reaching the north Hulett before the south Hulett toppled over.

We also believe the expert testimony that the cable would have broken before it could have pulled that big Hulett down and we add that the train would probably have been suddenly stopped or pulled off the tracks; that there would at least have been marks on some parts of the locomotive; and that certainly the man who was standing on the north end of the tender's tailboard (Morgan) would have seen the hanging cable. In fact he very likely would have had to jump for his life and it is within the range of probability that the Hulett, if it had been pulled over by the cable, might have fallen at least on part of the train, or the distance between the Hulett when it hit the ground and the south end of the train would have been much less.

Furthermore the only witness who suggests the train and hanging cable possibility was the tug captain who was not an impressive witness and who had an interest in avoiding blame for the accident. He testified that out of the darkness he heard someone (no one knows whom) say "It was that God damned line hanging down," but no one else seems to have heard this alleged remark and the tug captain's testimony is offset by more credible evidence. If such a statement was made it might have been directed at a line from the ship—not necessarily the Hulett. The physical facts show where the train must have been when the Hulett fell and D. Lail, a workman who was in the upper structure of the Hulett when it toppled, said the cable was up and not hanging. In addition, if the train had caught any cable the Hulett would not have moved south before falling as all testimony on that point reveals.

We can understand how the master of the ship might have entered in his log that he was responsible for capsizing the rig, until he heard about the cable. But when he got that news his attention should and we believe would have been challenged

if he had any doubts in his own mind and he should have and we believe would have demanded that he be permitted to see the engine which was then still in operation. He must have been pretty certain, as were other members of his crew, that the Bradley had caused the damage, and it was a long time after the accident before any suggestion was advanced by defendant that possibly the train was responsible.

The position of defendant is not enhanced appreciably by the experiment allegedly conducted by the captain of the ship and by which he claims he proved that as a matter of physical fact the Bradley could not have caused the accident.

This court believes that if any experiment such as defendant's master claims he carried out had resulted in positive proof that the Hulett could not have been engaged by the bead or any other part of the Bradley, defendant would have lost no time acquainting plaintiff with that fact and invited plaintiff to observe such experiment for itself. On this point the undisputed evidence shows that plaintiff offered to permit defendant to conduct such an experiment but defendant refused the suggestion. Our conclusion cannot be other than that if such an experiment was carried out by defendant's master either the result was inconclusive or substantiated plaintiff's position.

What caused the accident?

A poor lookout, The Commonwealth, 9 Cir., 36 F.2d 581; Dahlmer v. Bay State Dredging & Contracting Co., 1 Cir., 26 F.2d 603; The Walter A. Luckenbach et al. (Luckenbach S. S. Co. v. Union Oil Co. of California), D.C., 4 F.2d 551, a momentary lapse of caution; failure to appreciate the importance of inches; disregard of the known physical surroundings; failure to consider effect of the velocity of the wind; failure of the captain to anticipate full possibilities of the flare of his own ship when the stern was at varying degrees from the dock; any one or all of these might have entered into or been the cause of that accident. And even the captain's testimony on instructions given by him for backing out his ship are inconsistent. At one point he said he wanted the ship backed out "parallel to the dock," in the event of which no flare could overhang the dock, while at another point he said he wanted the bow kept flush with the dock, which would present a decided flare when that part of the bow between frames 25 and 27 was rubbing the dock. The captain was undoubtedly an able master but "even an expert" doing "what his judgment approves" can "be found negligent." The Germanic, 196 U.S. 589, 25 S.Ct. 317, 318, 19 L.Ed. 610.

In short there are many possibilities and probabilities from the known facts that obligates this court concluding negligence in navigation of the vessel but little to indicate, and nothing to prove, that the train could have caused this accident unless, as stated, we are to disbelieve all pertinent testimony of plaintiff's witnesses. This we are not inclined to do.

But while no one actually testified that they had seen the Bradley come in contact with the Hulett and while the doctrine of res ipsa loquitur does not prevail in Michigan, Detroit Edison Co. v. Knowles, 7 Cir., 152 F.2d 422; Thurkow v. City of Detroit, 292 Mich. 617, 291 N.W. 29, by the great weight of authority this court may arrive at its own conclusion on the facts and circumstances as they then existed, particularly as to whether or not there was negligence. Legitimate inferences from established facts are proper. Grimes v. King, 311 Mich. 399, 18 N.W.2d 870; Curtis v. Sears, Roebuck & Co., 298 Mich. 539, 299 N.W. 706; Anderson v. Kearly, 312 Mich. 566, 20 N.W.2d 728; 45 C.J. 1196. Cases cited by defendant, Commercial Molasses Corp. v. New York Tank Barge Corp., 314 U.S. 104, 62 S.Ct. 156, 86 L.Ed. 89; Pennsylvania Railroad Co. v. Chamberlain, Administratrix, 288 U.S. 333, 53 S.Ct. 391, 77 L.Ed. 819, are not in conflict with the above, but the facts in those cases are not in harmony with the issue here where we are reasonably certain we know the cause of this accident.

It must also be considered that no one measured the distance the Bradley stern was from the dock that night; that such distance varied, and that the only reasonable conclusion one can arrive at is that

since this accident did happen and the Hulett was toppled over, the Bradley in some manner engaged the Hulett.

This conclusion is fortified when we recall that the only expert who testified said that when the stern of the Bradley was 15 feet out from the dock it had an overhang of 24 inches and when it was 25 feet out it had an overhang of 30 inches between frames 25 and 27 which, we must repeat, was right near the point where the bead of the forecastle came. He also said that the bulwarks of the vessel would have contacted the Hulett girder at the very point where the gray paint was found on the Hulett. This is not denied except by defendant's alleged experiment.

It is also a fact that the extreme west end of the Hulett was at least 15½ inches in from the west edge of the dock to which space must be added whatever part of the wooden bumper that had not been worn down.

■ Therefore on this first issue we conclude that there must have been negligence in navigation of the ship and that such negligence caused the accident. We believe that after it had successfully passed the first Hulett either the Bradley's stern was out farther from the dock when it neared the second Hulett than its captain thought or maneuvering of the tug shoved the bow at its place of widest flare dockward and into contact with the Hulett.

## Conclusions of Law.

■ We find therefore that defendant's master did not manage his vessel with ability and ordinary care but negligently encroached upon plaintiff's dock. We also find that the Bradley in moving towards the south engaged itself with a fixed object on the dock at least 15 or 15½ inches in from the face thereof, to-wit, the Hulett, and this being true, we hold defendant was guilty of prima facie unexplained negligence. Inland and Seaboard Coasting Company v. Tolson, 139 U.S. 551, 11 S.Ct. 653, 35 L.Ed. 270, and cases cited; Pennsylvania R. Co. v. Ropner et al. C.C., 105 F. 397; The Lucille, D.C., 169 F. 719; The Granite State, 70 U.S. 310, 3 Wall. 310, 18 L.Ed. 179; The Cullen No. 32, 2 Cir., 62 F.2d 68.

## Contributory, Discovered, Concurrent or Continuing Negligence.

The issues involved in this case are not settled however by our conclusion that defendant's captain was negligent in navigating the Bradley causing the Hulett to topple over. This is not of itself determinative since defendant insists that plaintiff is guilty of either contributory, discovered, concurrent, or continuing negligence in, to-wit:

1. Failing to properly maintain the wooden fender strake or bumper which kept vessels away from touching the concrete of the dock;

2. Failing to observe custom by moving the Hulett out of danger;

3. Leaving the Hulett locked and so near to the coal tower;

4. Failing to adequately light the various machines and along the dock; and

5. Inviting defendant into a slip that was of such construction as of itself to be dangerous to users thereof.

■ We will discuss these separately bearing constantly in mind that this was a slip into which vessels came for the purpose of unloading—not an open river or a harbor—and that it was widely used since any one or all of the innumerable materials needed in manufacturing by the great Ford plant were unloaded at that dock from time to time. Furthermore, we must start with three admissions, two of law; and the other of fact. First, that there is an obligation on the part of the dock owner to maintain its dock in a safe condition, Lackawanna Steel Co. v. Pioneer Steamship Co., 69 Miss. 104, 124 N.Y.S. 833; Id., 148 App.Div. 465, 132 N.Y.S. 980; The Cullen No. 32, 2 Cir., 62 F.2d 68; Maryland Casualty Co. v. Matson Navigation Co., 177 Cal. 610, 171 P. 427; second, that negligence on plaintiff's part as a contributing factor to the accident is a complete defense, Inland & Seaboard Coasting Co. et al. v. Tolson, supra; Wiles v. New York Central R. Co., 311 Mich. 540, 19 N.W.2d 90; and third, that the wooden bumper being unquestionably much used was therefore worn down at least an inch or two although there was proof that the

maintenance crew had recently replaced all timbers noticeably worn.

### 1. The Wooden Bumper or Fender Strake.

█ But according to the testimony that bumper was not there for the purpose of keeping vessels far enough away from the dock so their flare might not come in contact with objects on the dock. The wooden bumper was there so that ships wouldn't rub against the concrete, damaging both their sides and the dock. Furthermore, under facts of this case if the bumper hadn't been there at all or down almost flat with the face of the dock, this accident would have happened if the Bradley had been navigated negligently as it undoubtedly was that night. There is no proof or substantial indication that failure of the bumper to extend out 8 inches caused or contributed to this accident and this is particularly true since the captain said he was watching how far away his boat was from the dock itself, not the wooden bumper down near the water which he couldn't see unless he went over to the side of his ship. Nor was there any proof that he even knew the bumper was there or depended in any way upon its extending a full 8 inches from the dock's face. Lack of a full 8 inch bumper, if true, was not the proximate cause of this accident.

### 2. Custom of Moving Huletts.

On the theory of plaintiff's possible contributory negligence this court permitted defendant to prove a custom at other docks. Testimony was admitted to show that it was a custom for dock owners to move the Huletts out of the way up or down the dock, so they would not be a menace or danger to vessels moving out after loading or unloading. This defendant insists, should have been done by plaintiff's employees.

█ Plaintiff took exception to admission of this evidence alleging it was not prepared to meet it and that furthermore such custom had not been pleaded. 25 C.J.S., Customs and Usages, § 32. But the court was interested in getting all the facts and would have permitted any proper amendment of pleadings if necessary for that purpose. On the other hand it would have permitted plaintiff any adjournment to meet testimony not anticipated or prepared against. No request has yet been made to submit such evidence and we believe rightly, because it appears to this court that the unusual position of the Hulett in this particular case destroys the legal and equitable effect of any custom that might have existed at other docks on the Great Lakes. We are not prepared to admit that any such custom was proven but granting this to be true, the evidence shows that defendant's captain knew they didn't move the Huletts on this Ford dock. This Hulett was set back 8 inches farther than its manufacturer had recommended for safety and almost 16 inches from the edge of the dock, so we hold that any custom or practice of moving Huletts at other docks was, we believe, restricted to a fact and physical situation entirely different from the case at bar, Such Huletts were either flush with their dock edge or extended over, and it is our belief that there was no obligation on the part of the Ford Company to move that Hulett under the circumstances. Dahlmer v. Bay State Dredging & Contracting Co., 1 Cir., 26 F.2d 603; In re Pennsylvania R. Co., 2 Cir., 48 F.2d 559. Furthermore such failure to move the Hulett was not an act of negligence because defendant made no pretence of relying on such alleged custom or practice.

### 3. Unlocking of Huletts.

█ Nor was there any obligation on the part of plaintiff to unlock its Hulett or remove it from proximity to its coal tower. Might not an unlocked Hulett have been more of a menace than a locked one? Is one's failure to set the emergency brake on his car an act of negligence when some speed demon rams his automobile in the rear and sends it careening into an innocent bystander? It must always be remembered that both the Hulett and the coal tower were on the dock where they had a right to be and the case of In re Pennsylvania R. Co., supra, cited by defendant does not apply here.

#### 4. Illumination of Machines and Dock.

 Nor was there any obligation that Ford Motor Company illuminate the entire surrounding landscape as light as day in order to be free from negligence. Groping in the dark didn't cause the accident and there was abundant evidence that the lighting on the machinery and dock was sufficient especially when the ship's own flood lights were lit. On this point also the positive testimony that the Hulett was lighted is of greater weight than negative testimony, that the witness saw no light. The Commonwealth, 9 Cir., 36 F.2d 581.

#### 5. Other Negligence of Plaintiff.

 Approaching defendant's last contention we find that the captain of the Bradley had been going into that slip over a period of 11 years. And on this occasion was only an invitee in the sense that he was delivering goods ordered by plaintiff from defendant. Describing him as an "invitee" therefore gives wide latitude to the meaning of that word. Nevertheless he had been in there with the Bradley at least 10 times. He knew the Bradley was one of the largest vessels on the Great Lakes and if he didn't know the extent of its flare he should have. He came into the slip that very afternoon and had to pass right by those two Huletts. He knew he had to back or be pulled out. He knew also that he would finish unloading around midnight. He knew the physical surroundings of that slip as well as any person there including the dock foreman because the dock foreman had probably viewed the slip and surroundings so may times that its lurking dangers to navigation, if any, might not have been as apparent to him as they would to a ship captain navigating one of the largest boats on the Great Lakes. Yet defendant in its brief (page 26) seeks to charge plaintiff not only with a more intimate knowledge of dock and slip physical situation than the master had, but defendant insists that the Ford employees should have known more about the Bradley's overhang than the Bradley's captain. This is surely an extreme contention, to say the least. The Bradley master knew he would have to back out in the dark and certainly he should have taken more precaution than he did. For defendant to now insist that its negligence, if any, must have been apparent to Ford employees on the dock who should have then challenged its captain's attention to the Huletts, is without merit. Ignoring the element of time and the emergency presented if plaintiff's employees, seeing and appreciating the danger, had criticized or directed defendant's captain in his navigation, this court can anticipate what reply Captain Pearse might have made. He probably would have remarked that he was captain and knew what he was doing. Furthermore, the dock foreman admitted he didn't know anything about navigating and there was no obligation on him or any of the laborers to direct the Bradley master unless they saw a danger he apparently wasn't aware of, not a danger he knew about as well, if not better, than any one of them might know. In addition these men could have anticipated no danger because the Bradley had just cleared the first Hulett by three feet according to the testimony of the Bradley mate. Incidentally it appears to this court that if the captain had noticed how barely he had missed the north Hulett, as he said he did, he should have made doubly sure that he would clear the second Hulett by a greater distance.

 There is no evidence that the slip was too small or poorly constructed and we see no application of the several discovered peril and concurrent negligent cases cited by defendant except as they emphasize that defendant should have known its own peril. The theory of discovered peril is that the injured party's negligence sufficiently preceded that of defendant so that defendant had an opportunity to avoid the accident and didn't, while concurrent negligence implies the thought and theory that the negligence of both parties, though not of equal character, nevertheless occur practically simultaneously. If plaintiff can be construed to be negligent in any manner, defendant's master certainly should have discovered such negligence. Failure to do so makes him guilty of discovered or gross negligence and presents the "last clear chance" doctrine not for defendant but against it. Klutt v. Philadelphia & R. Ry. Co., 3 Cir.,

142 F. 394; Chunn v. City and Suburban Railway, 207 U.S. 302, 28 S.Ct. 63, 52 L. Ed. 219; Pennsylvania R. Co. v. Swartzel, 7 Cir., 17 F.2d 869.

This is not the case of some object being submerged or extending out into the channel. Lackawanna Steel Co. v. Pioneer Steamship Co., 148 App.Div. 465, 132 N.Y. S. 980; Smith v. Burnett, 173 U.S. 430, 19 S.Ct. 442, 43 L.Ed. 756; M. & J. Tracy Inc., v. Marks, Lissberger & Son, 2 Cir., 283 F. 100, and there is no act of God involved so far as we can see.

On the other hand we believe that if plaintiff was guilty of any negligence it was continuing not discovered, Great Lakes Towing Co. v. Kelley Island Lime & Transport Co. et al., 6 Cir., 176 F. 492, but this issue is disposed of by our further conclusion that there was no negligence at all on plaintiff's part.

This accident was unfortunate and costly but we believe the captain of the vessel Bradley arrived at the right conclusion on the night of the accident, to-wit, that the bead of his ship caught the Hulett and toppled it over.

For the various reasons given we find for plaintiff and if the parties are unable to agree upon damages we will either appoint a master or this court will take the evidence.

### Additional Opinion on Damages.

Plaintiff having submitted a proposed judgment following our original opinion in the above matter, defendant objected, and the court herein now passes upon those objections.

▮ The court has considered the question of interest and has determined that plaintiff company would be entitled to interest computed on two different sums. The court grants interest on the Hulett, after depreciation, to-wit, on the sum of $135,428.52

| | |
|---|---|
| Plus expense of removal of the damaged Hulett | 20,332.24 |
| Plus damages allowed for the Mead Morrison | 4,128.26 |
| Total | $159,889.02 |

less the following sums secured from salvage, to-wit:

| | |
|---|---|
| Electric motors | $5,000.00 |
| Scrap | 5,441.25 |
| 1. Part of the salvage computed at 50% | 11,550.00 |
| 2. Salvage of $15,000 computed at 50% | 7,500.00 |
| Total credit against the above | 29,491.25 |
| Balance | $130,397.77 |

or interest at 5% from December 30th, following the date of the accident, on said remaining sum total of $130,397.77.

Then there were other damages allowed plaintiff by this court as follows:

| | |
|---|---|
| Vessels delivering limestone | $18,750.00 |
| Vessels delivering coal | 7,000.00 |
| Barges delivering coal | 2,100.00 |
| Loss of man hours | 19,934.38 |
| Total | $47,784.38 |

Interest on this is to be computed from November 30, 1945, by which date all expenses, other than those incurred following the accident, had been determined subject only to computation.

As to why the court did not allow depreciation from 1918, our answer is that we were governed entirely by testimony before us. The court was aware that the Hulett, with certain repairs of course, had already been in operation for 30 years, and there was evidence that some Huletts had been in use 50 years. Considerable leeway is permitted the court in arriving at what it determines to be a just figure. Here the testimony reveals that the actual use of this particular Hulett did not begin until 1922, and while, as a bookkeeping entry, it did depreciate, we believe that selecting 35 as the number of years that the Hulett could and would be used was fair. If it favors either party it favors defendant rather than plaintiff on testimony before this court.

The claim presented by defendant that the court has allowed damages twice for

470

the time the boats were moored at the dock in the sums of, to-wit, $19,000 and $27,000, has also been given further consideration. The $19,000 allowed in damages was for the actual expense paid by plaintiff caused by delay in unloading. For example, it took the men a total of 376 hours extra time to unload the boats as they came in, all because of this accident. Then plaintiff had to hire other vessels to bring its limestone and coal, and the other sum allowed is for that expense. True, the Henry Ford and the Benson Ford could have been used in carrying these commodities, but they had always been chartered by others to carry iron ore during the war years. This was a profit plaintiff had made before the accident. It was as much entitled to charter those freighters to others after the accident as before and plaintiff should not be obliged to lose profits on an entirely different endeavor because of the wrong committed by defendant.

Plaintiff may submit a judgment based upon this additional opinion.