**Alan G. HILL, Jr., and James A. Brink, as Trustees of the Rocky Neck Sport Fishing Dock Trust, Libellants,**

v.

**FISHING VESSEL ST. ROSALIE, her Engines, Tackle, Equipment and Appurtenances, Libellee.**

**Civ. A. No. 66-777.**

United States District Court
D. Massachusetts.

Dec. 18, 1967.

Blair L. Perry, Hale & Dorr, Boston, Mass., for plaintiff.

Frank Handy, Richard B. Kydd, Kneeland & Splane, Boston, Mass., for defendant.

## OPINION

JULIAN, District Judge.

This is an in rem proceeding in which the libellants, owners of the vessel VICTORY, seek to recover damages sustained by them when the VICTORY was struck and partially sunk by the fishing vessel ST. ROSALIE in Gloucester Inner Harbor on the morning of July 14, 1966.

### Findings of Fact

The VICTORY was a wooden vessel of 12 gross tons, 40.5 feet in length, powered by a diesel engine. She was operated by the libellants out of the Port of Gloucester, Massachusetts, as a party fishing boat carrying passengers on a charter basis on fishing excursions.

Libellants are the Trustees of the Rocky Neck Sport Fishing Dock Trust, a Massachusetts business trust, and in that capacity were the owners of the VICTORY.

The respondent fishing vessel ST. ROSALIE was owned at all times relevant hereto by the intervening claimant, Boat Maria Immaculata, Inc., a Massachusetts corporation.

The fishing vessel ST. ROSALIE is a wooden commercial fishing vessel of 65 gross tons, 65 feet in length, operated by the claimant out of the Port of Gloucester, Massachusetts.

At approximately 7:30 a. m. on July 14, 1966, the ST. ROSALIE struck and damaged the VICTORY as the VICTORY sat at her mooring in a mooring area located in Gloucester Inner Harbor. At the time of the accident the sea was calm, the weather clear, visibility unlimited, and wind velocity insignificant.

At the time of the collision the VICTORY was not, nor had she been, moving through the water. She was standing still in the water, properly moored to a mooring duly assigned to her by the Harbor Master of Gloucester, preparing to get under way, with her engine in operation but not engaged. The captain of the VICTORY was holding in his hand the end of the mooring line, which he had untied from the boat and snagged around a post on deck, thus holding the boat fast to the mooring. He and a crew member had boarded the VICTORY only moments before. The crew member was in the process of making fast to the VICTORY the small punt they had used to travel from the shore. Neither man saw the ST. ROSALIE until a few seconds before she struck the VICTORY.

The mooring at which the VICTORY was tied was located within an area of the Inner Harbor designated by the Harbor Master for mooring purposes. The VICTORY's stern, which was the closest part of that vessel to the channel, was at least 10 yards from the southwesterly edge of the main channel for shipping traffic. The edge of the channel was clearly marked by buoys.

Several minutes prior to the collision the ST. ROSALIE left the Ocean Crest fish pier, located at the innermost end of Gloucester Inner Harbor, and proceeded southwesterly toward the mouth of the Inner Harbor at a speed of approximately 7 knots. The captain in charge of the ST. ROSALIE was in the pilot house steering the vessel down the center of the 200-foot-wide channel.

The ST. ROSALIE had no lookout. At least five crew members were at work on the forward deck, but their attention was concentrated on their activities there rather than on the vessel's course.

As the ST. ROSALIE proceeded down the channel the mooring area in which the VICTORY rode at mooring lay to the ST. ROSALIE'S starboard side. Just prior to the collision the ST. ROSALIE veered to starboard from her course, left the channel, and entered the mooring area. The bow of the ST. ROSALIE

struck the VICTORY on the latter's starboard stern quarter. There was nothing to obstruct the captain's view of the mooring area and of the VICTORY as he sailed down the channel and approached the scene of the collision. Nevertheless, he did not see the VICTORY at any time before he struck her. His failure to keep the ST. ROSALIE on its proper course and to see the VICTORY in time to avoid colliding with her was due to his carelessness and inattention. The collision and the resulting damage to the VICTORY were caused solely by the captain's negligent operation of the ST. ROSALIE. At the time of the collision the captain was the employee of the claimant and was acting within the scope of his employment.

The impact of the collision sheared off the VICTORY's stern transom, which floated away. The VICTORY's bow rose high in the water, and the boat's forward section shot forward a few yards but quickly settled in the water. The forward section, from which the two crew members were rescued by a passing lobsterman, sank almost completely, only the prow remaining above water. Both parts of the boat were eventually towed to shore.

Although the captain and others aboard the ST. ROSALIE knew that she had collided with the VICTORY and that as a result of the collision the VICTORY was sinking rapidly, and although the VICTORY sank about 10 yards from the point of collision, the ST. ROSALIE rendered no assistance to the stricken vessel or its crew[1] but, instead, continued toward the mouth of the harbor without stopping.

The captain of the ST. ROSALIE failed to stay by the VICTORY although he could have done so without danger to the ST. ROSALIE and its crew, and failed to do any of the things required by 33 U.S.C. § 367. No reasonable cause for such failure has been shown.

There is no credible evidence in this case that it was not within the power of the ST. ROSALIE to have prevented the collision by taking reasonable and practicable precautions.

### Conclusions of Law

■■ This case is governed by the statutory rules for navigation in inland waters generally. 33 U.S.C. § 151 et seq. As a "steam vessel" within the meaning of those rules,[2] the ST. ROSALIE (and her owner, or, master) had a legal duty to take any precautions required by the ordinary practice of seamen and, particularly, to keep a proper lookout. 33 U.S.C. § 221. One precaution clearly required by the ordinary practice of seamen is that of ensuring that a vessel does not wander out of a channel into a mooring area and there strike a properly moored vessel.

■ The VICTORY was a properly moored vessel with which the ST. ROSALIE, a moving vessel, collided. In these circumstances the ST. ROSALIE is presumed to be negligent unless the libellee can show, which it has not done, that it was not within the ST. ROSALIE's power to have prevented the collision by taking reasonable and practicable precautions. The GRANITE STATE, 1865, 70 U.S. (3 Wall.) 310, 18 L.Ed. 179; The ORION (Dahlmer v. Bay State Dredging and Contracting Co.), 1 Cir., 1928, 26 F.2d 603, 605; The BARCLAY, S.D.N.Y., 1934, 9 F.Supp. 480, 483; Petition of United States Dredging Corp., S.D.N.Y., 1964, 225 F. Supp. 730. Thus, not only is the ST. ROSALIE presumed negligent, under the law, but on the evidence the Court has also found that her master failed to use due care and that his negligence was the sole cause of the collision.

■ Additionally, there is present in this case the legal presumption of fault

---

[1]. The ST. ROSALIE was outfitted with a life raft as well as life rings, none of which were employed to help the VICTORY.

[2]. 33 U.S.C. § 155 defines the word "steam vessel" to include "any vessel propelled by machinery."

on the part of the ST. ROSALIE arising from her captain's failure to stay by the VICTORY and to render the assistance and to do the other things required by the so-called "Stand-by Act." 33 U.S.C. § 367. The Court has found that the ST. ROSALIE's master failed without reasonable cause to comply with the requirements of that Act.

■ There is no merit in libellee's contention that the VICTORY was at fault in not having a watch on duty who might have warned the helmsman and thus have enabled the VICTORY to take evasive action. The VICTORY was tied at a properly designated *mooring* in broad daylight and was not bound to the same requirements expected of ships *anchored* in channels plied by other ships. The GRANITE STATE, 1865, 70 U.S. (3 Wall.) 310, 313, 18 L.Ed. 179. The cases cited by the libellee, which concern either vessels anchored in regular shipping lanes[3] or collisions between two anchored vessels one of which drifts on its anchor,[4] are not in point. Furthermore, it does not appear on the facts of this case that any action taken by the VICTORY could have prevented the collision.

This Court holds that the ST. ROSALIE, through the negligence of her captain, was at fault in causing the collision.

The Court therefore finds for the libellants.

The issue of liability was severed by the Court from the issue of damages and tried separately. The case is now in order for trial on the issue of damages.[5]

---

3. The HENRY WARNER, D.Mass., 1886, 29 F. 601 [ship anchored at night on high seas in Nantucket shoals]; The LE-HIGH, W.D.N.Y., 1935, 12 F.Supp. 75 [tug and barges anchored at night across mouth of channel entrance to Detroit River]; The GUYANDOTTE, E.D.N.Y., 1889, 39 F. 575 [barge anchored at night in middle of Elizabeth River]; Churchill v. Altenower, E.D.La., 1889, 39 F. 118 [ship anchored at night in Mississippi River].

4. Ciudad De Reus, 2 Cir., 1911, 185 F. 391 [two steamships anchored in Upper New York Bay]; see also The SAP-PHIRE, 1870, 78 U.S. (11 Wall.) 164, 171, 20 L.Ed. 127 [two ships anchored in San Francisco harbor].

5. On January 9, 1968, judgment was entered for the plaintiffs in the amount of $8,900 by agreement of the parties.